UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

PAUL CASALE and ANTHONY GARCIA,
on Behalf of Themselves and Others
Similarly Situated,                                        No. 08 Civ. 2173 (SAS)

                       Plaintiffs,

            -against -

RAYMOND W. KELLY, Commissioner of the
New York City Police Department (NYPD); *et al.*,

                       Defendants.
------------------------------------------------------------x

MICHAEL BROWN, on Behalf of Himself
and Others Similarly Situated,

                             No. 05 Civ. 5442 (SAS)

                      Plaintiff,

            -against -

RAYMOND W. KELLY, Commissioner of the
New York City Police Department (NYPD); *et al.*,

                       Defendants.
------------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR CONTEMPT, A PRELIMINARY INJUNCTION, AND DISCOVERY SANCTIONS

Emery Celli Brinckerhoff & Abady LLP
75 Rockefeller Plaza, 20th Floor
New York, New York 10019

The Bronx Defenders
860 Courtlandt Avenue
Bronx, New York 10451

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................iii-v

PRELIMINARY STATEMENT........................................................................... 1

SUMMARY STATEMENT OF RELEVANT FACTS................................................ 3

    Defendants' Ongoing Enforcement of the Void Statute in the *Brown v. Kelly*
    Litigation........................................................................................................ 3

    Defendants' Ongoing Enforcement of the Void Statutes in the *Casale v. Kelly* Litigation....... 4

ARGUMENT ....................................................................................................... 6

   I.    THE CITY OF NEW YORK AND COMMISSIONER KELLY SHOULD BE
       FOUND IN CONTEMPT OF COURT ....................................................... 6

     A.   The Court's Orders Were Clear and Unambiguous ........................................ 7

     B.   Plaintiffs' Proof of Defendants' Noncompliance is Clear and Convincing .................. 8

     C.   Defendants Were Not Reasonably Diligent in Attempting to Comply........................... 8

        1.   Defendants Did Nothing to Monitor to Halt the NYPD's Widespread Use
           of "Cheat Sheets" Until Plaintiffs' Counsel Uncovered the Problem and
           Threatened Contempt.................................................................................. 9

        2.   Defendants Did Not Inspect Penal Law Copies in Precinct Libraries to
           Confirm Deletion of the Statutes Until Threatened with Contempt ........................ 12

        3.   Defendants Did Not Meaningfully Train or Discipline Police Officers
           Until Faced with Contempt........................................................................ 13

        4.   Defendants Obstructed Discovery In Order to Prevent Oversight of the
           NYPD and Tracking of the Ongoing Enforcement................................................ 15

        5.   Defendants Consistently Fail to Act Unless Faced With Contempt ......................... 17

     D.   The Court Should Impose Civil Sanctions on Defendants ............................................ 20

II.   PRELIMINARY INJUNCTIVE RELIEF SHOULD BE ORDERED ............................. 23

III.   THE CITY VIOLATED ITS DUTY TO PRESERVE EVIDENCE ................................ 30

CONCLUSION .............................................................................................................. 32

## TABLE OF AUTHORITIES

**FEDERAL CASES**:

*ACLI Gov't Securities, Inc. v. Rhoades*,
No. 81 Civ. 2555 (SAS), 1995 WL 731627 (S.D.N.Y. Dec. 11, 1995)...............................21, 23

*Aspira v. Bd. of Educ.*,
423 F.Supp. 647 (S.D.N.Y. 1976)..................................................................................8, 20

*Babee-Tenda Co. v. Scharco Manu. Co.*,
156 F. Supp. 582 (S.D.N.Y. 1957).......................................................................................9

*Badgley v. Santacroce*,
800 F.2d 33 (2d Cir. 1986).................................................................................................6

*Benjamin v. Fraser*,
No. 75 Civ. 3073, 2002 WL 31845111 (S.D.N.Y. Dec. 16, 2002)....................................19, 20

*Benjamin v. Sielaff*,
752 F.Supp. 140 (S.D.N.Y. 1990)......................................................................................19

*Brown v. Kelly*,
244 F.R.D. 222 (S.D.N.Y. 2007) .........................................................................................3

*Brown v. Kelly*,
No. 05 Civ. 5442, 2007 WL 1573957 (S.D.N.Y. May 31, 2007)..........................................1, 26

*Chambers v. Nasco, Inc.*,
501 U.S. 32 (1991)............................................................................................................6

*Charette v. Town of Oyster Bay*,
159 F.3d 749 (2d Cir. 1998)..............................................................................................24

*Commodity Futures Trading Comm'n v. Cohen*,
284 F.3d 404 (2d Cir. 2002)..............................................................................................23

*E.E.O.C. v. Local 638*,
889 F.Supp. 642 (S.D.N.Y. 1991)......................................................................................23

*Ex Parte Robinson*,
19 Wall, 505 (1874) ...........................................................................................................6

*Green Party v. New York State Bd. of Elections*,
    389 F.3d 411 (2d Cir. 2004)................................................................................24

*Int'l Union, United Mine Workers of America v. Bagwell*,
    512 U.S. 821 (1994)................................................................................21

*Jolly v. Coughlin*,
    76 F.3d 468 (2d Cir.1996)................................................................................24

*Levin v. Tiber Holding Co.*,
    277 F.3d 243 (2d Cir. 2002)................................................................................8

*Loper v. New York City Police Dep't*,
    999 F.2d 699 (2d Cir.1993)................................................................................3, 4

*NBA v. Design Mgmt. Consultants, Inc.*,
    289 F. Supp.2d 373 (S.D.N.Y. 2003)................................................................................7

*New York State Nat'l Org.for Women v. Terry*,
    886 F.2d 1339 (2d Cir. 1989)................................................................................21

*NOW 1998*,
    159 F.3d 86 (2d Cir. 1998)................................................................................22, 23

*Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc.*,
    369 F.3d 645, 655 (2d Cir. 2004)................................................................................6, 21

*Perfect Fit Indus., Inc. v. Acme Quilting Co., Inc.*,
    673 F.2d 53, 56 (2d Cir. 1982)................................................................................21

*Playboy Enterprises, Inc. v. Chuckleberry Publishing, Inc.*,
    939 F.Supp. 1032 (S.D.N.Y. 1996) ................................................................................23

*Powell v. Ward*,
    643 F.2d 924 (2d Cir. 1981)................................................................................8

*Residential Funding Corp. v. DeGeorge Financial Corp.*,
    306 F.3d 99 (2d Cir. 2002)................................................................................32

*Simkin v. US*,
    715 F.3d 34 (2d Cir. 1983)................................................................................21

*Titra Cal., Inc. v. Titra Film*,
    No. 98 Civ. 0234, 2001 WL 1382587 (Nov. 6, 2001 S.D.N.Y.) ................................................21

*U.S. v. Yonkers*,

856 F.2d 444 (2d Cir. 1988)...................................................................3, 8, 21

*United States v. United Mine Workers,*
    330 U.S. 258 (1947)....................................................................................23

*Weitzman v. Stein,*
    98 F.3d 717 (2d Cir. 1996)........................................................................21

*Zubulake v. UBS Warburg LLC,*
    220 F.R.D. 212 (S.D.N.Y. 2003) ...............................................................31

*Zubulake v. UBS Warburg LLC,*
    229 F.R.D. 422 (S.D.N.Y. 2004) ...............................................................31

## **STATE CASES**:

*People v. Bright,*
    71 N.Y.2d 376, 526 N.Y.S.2d 66 (1988) .....................................................5

*People v. Uplinger,*
    58 N.Y.2d 936, 460 N.Y.S.2d 514 (1983) ...................................................5

## **STATE STATUTES**:

New York Penal Law § 240.35(1) .......................................................... passim

New York Penal Law § 240.35(3) .......................................................... passim

New York Penal Law § 240.35(7) .......................................................... passim

## **FEDERAL RULES**:

Fed. R. Civ. P. 37(b) .................................................................................34

## PRELIMINARY STATEMENT

Plaintiffs in two related certified class actions, *Casale v. Kelly*, 08 Civ. 2173 (SAS) and *Brown v. Kelly*, 05 Civ. 5442 (SAS), bring this motion for contempt, preliminary injunctive relief, and discovery sanctions against defendants the City of New York and New York City Police Commissioner Raymond W. Kelly.

Since May 31, 2007, when this Court denied plaintiffs' prior motion for contempt in *Brown v. Kelly*, defendants have continued to enforce the unconstitutional loitering statutes – N.Y. Penal Law §§ 240.35(1), (3), and (7) (hereinafter "the Statutes") – at a substantial rate, and in violation of the explicit orders of this Court to stop.  In the 29 months since this Court demanded the City's "urgent attention" to compliance with its orders until "no more summonses for violations of an unconstitutional statute are issued," *see Brown v. Kelly*, No. 05 Civ. 5442, 2007 WL 1573957, at *6 (S.D.N.Y. May 31, 2007) ("*Brown I*"), 233 different police officers from 76 different commands have issued 269 illegal summonses prosecuting the Statutes.  Smyth Decl. ¶ 48.  As recently as October 28, 2009, defendants issued a summons for one of the Statutes, and in early October the NYPD even issued a summons to Eddie Wise, the original plaintiff in *Brown v. Kelly*.  *Id.* ¶ 17, Ex. A.

Defendants' conduct is particularly egregious because it so easily could have been avoided.  As this Court rightly noted in its last ruling on the same misconduct by the same defendants, "the unconstitutional enforcement . . . undoubtedly could have been minimized or avoided altogether had defendants been proactive about their compliance from the start." *Brown I* at *1-2.  Just as in 2005, when defendants took initial steps aimed at ending the unlawful enforcement of the Statutes, but "seem to have done little thereafter," defendants have repeated

1

this pattern, taking cursory remedial "baby steps" in 2008 and doing nothing thereafter. Defendants should be found in contempt of this Court's prior Orders prohibiting enforcement of the Statutes, and the Court should order a prospective coercive sanctions of $5,000 for each instance of future enforcement, to be suspended for a six-month grace period to allow time for plaintiffs' proposed injunctive relief to be implemented.

Since the last contempt motion in 2007, plaintiffs and this Court have repeatedly cajoled, demanded, and threatened defendants to stop the NYPD's enforcement of the Statutes. As before, the most recent prospect of contempt (and multiple appearances before this Court during the fall of 2009) appears to have motivated defendants to propose solutions (albeit ill-conceived and incomplete ones) to the problem of ongoing enforcement. Defendants' promises alone have proven empty and ineffective. More is needed. Accordingly, plaintiffs also seek a preliminary injunction *requiring* defendants to act to halt enforcement of the Statutes, by reducing defendants' promises into enforceable court-ordered written policies that are mandatory, formal, transparent, and subject to review and monitoring by plaintiffs and the Court. Defendants' past failed, unwritten, and *ad hoc* plans have proven insufficient.

In March 2007, defendants represented to the Court that the issuance of summonses under the Statutes would shortly all but cease. Since that statement, defendants have issued hundreds more summonses for the Statutes. No month has passed since the Court's order to cease enforcement in June 2005 in *Brown* without the City issuing multiple summonses for violations for the Statutes. Smyth Decl. ¶ 46. The situation before the Court remains a "sorry tale of non-compliance." *Brown I*, *3. It is finally time for the City of New York and the Commissioner of the NYPD "to recognize [their] obligation to conform to the laws of the land,

and not step by step, order by order, but in the way that any responsible community concerned about the welfare of its citizens functions." *U.S. v. Yonkers,* 856 F.2d 444, 451 (2d Cir. 1988) (citation omitted).

**SUMMARY STATEMENT OF RELEVANT FACTS**

Plaintiffs respectfully refer the Court to the Declarations of Katherine Rosenfeld and J. McGregor S. Smyth Jr., both dated December 23, 2009, for a full recitation of the facts in support of this motion. A brief synopsis is set forth below.

**Defendants' Ongoing Enforcement of the Void Statute in the *Brown v. Kelly* Litigation**

In 1992, Judge Robert W. Sweet permanently enjoined the NYPD from enforcing N.Y. Penal Law § 240.35(1) ("loitering for the purpose of begging") and declared the statute unconstitutional on First Amendment grounds, a decision which the Second Circuit affirmed. *See Loper v. New York City Police Dep't,* 999 F.2d 699, 701 (2d Cir. 1993). Notwithstanding *Loper's* clear command, from 1993 to 2005, the NYPD charged thousands of people with violating § 240.35(1). *See Brown v. Kelly,* 244 F.R.D. 222, 229 (S.D.N.Y. 2007) ("*Brown II*").

On June 9, 2005, Eddie Wise commenced a putative class action complaining, that in violation of *Loper*, the City of New York, operating through the NYPD, continued to charge and prosecute thousands of individuals like himself for violations of the Statute. On June 23, 2005, this Court entered a stipulated Order directing, *inter alia*, that: "The City of New York, Robert Johnson, and their respective employees shall cease enforcement of New York Penal Law § 240.35(1)." Rosenfeld Decl. ¶ 3. The Court retained jurisdiction over the Order for enforcement purposes and to ensure compliance with its terms. *Id.*, ¶¶ 1, 8.

Notwithstanding the June 23, 2005 Order, defendants continued to arrest,

3

prosecute, and pursue charges via an alarming number of summonses, all for violations of §

240.35(1). *See Brown I* at *1; Smyth Decl. ¶ 36. In March 2007, plaintiffs moved for contempt.

On May 31, 2007, this Court denied the motion, stating as follows:

> Although plaintiff's motion is denied, I note that the issues it raised were not
> clear-cut. The steady rate of unlawful enforcement of section 240.35(1) that has
> persisted for almost thirteen years after *Loper* is simply unacceptable.
> Defendants' long-standing apathy towards this problem was offensive.
> Nevertheless, the Court is convinced that defendants have made avoiding
> contempt a top priority and are now striving to fully comply with the June 23,
> 2005 Order. Certainly, this includes treating the issuance of a single summons
> under section 240.35(1) as a serious problem deserving urgent attention. To this
> end, the Court is prepared to revisit the issue of defendants' diligence every two
> months, until every outstanding bench warrant has been vacated and no more
> summonses for violations of an unconstitutional statute are issued.

*Id*. at *6.

Since the Court's contempt ruling in *Brown* in May 2005, defendants' record of

enforcement of § 240.35(1) remains abysmal. From June 1, 2007 (the day after the Court denied

plaintiffs' motion) through October 31, 2009, 82 different Police Officers from 46 different

commands issued 96 illegal summonses for P.L. § 240.35(1) in violation of the Court's order,

causing irreparable First Amendment harm. Smyth Decl. ¶40. Within this time period, 10% of

officers and fully 50% of Commands were repeat offenders. *Id*. ¶41. In June 2007, the month

after the Court's decision, the NYPD issued 16 illegal summonses for § 240.35(1). *Id*. ¶39.

**Defendants' Ongoing Enforcement of the Void Statutes in the *Casale v. Kelly* Litigation**

In 1983 and 1988 the New York State Court of Appeals declared unconstitutional

New York Penal Law § 240.35(3) and § 240.35(7). Subsection 240.35(3) provides that a person

is guilty of "loitering" when he "loiters or remains in a public place for the purpose of engaging,

or soliciting another person to engage, in oral sexual conduct, anal sexual conduct or other sexual

4

behavior of a deviate nature." *See People v. Uplinger,* 460 N.Y.S.2d 514 (1983).  Subsection

240.35(7) provides that a person is guilty of "loitering" when he "loiters or remains in a

transportation facility, or is found sleeping therein, and is unable to give a satisfactory

explanation of his presence." *See People v. Bright,* 526 N.Y.S.2d 66 (1988).

   In March 2008, plaintiffs filed this action because, notwithstanding the clear

holdings of *Uplinger* and *Bright,* the City of New York, operating through the NYPD, willfully

continued to enforce these unconstitutional Statutes.  Between 1983 and 2007 alone, the City

enforced P.L. § 240.35(3) and § 240.35(7) over 15,000 times.  *See Casale v. Kelly,* 257 F.R.D.

396, 413 (S.D.N.Y. 2009).

   After the *Casale* action was filed and the Court ordered defendants to abide by

their self-professed policy of non-enforcement in May 2008, defendants issued dozens of

summonses for violations of the Statutes.  Given the history of this case, defendants' record of

enforcement and noncompliance is especially stunning.  From May 3, 2008 through October 31,

2009, 71 different police officers from 39 different commands issued 84 illegal summonses for

P.L. 240.35(3) or (7) in violation of the Court's order.  Smyth Decl. ¶ 44.

   On November 9, 2009, the Court aptly summarized the situation as follows:

> I'm really not going to be interested in any excuses.  It's too painful.  The case is
> too old.  The violation is too old.  How in the world [do] these keep getting
> issued, I don't understand.  How there are 124 since May '08 is kind of beyond
> me. . . .
>
> [The police department] is never going to do it unless they're punished for every
> time they issue a summons that's illegal.  Every time.  Let's just talk about
> punishment.  We've reached that point. . . . I have said this over and over, and all
> my talking and all my voice raising is doing nothing.  It's time for action.  How
> about we just have a $5,000 fine every time an illegal summons is issued.  Do you
> think that might get their attention, because all my talking on the bench has never
> grabbed the city's attention.  It's just like, Oh, well, there she goes again, but she

hasn't done anything.  So until there is a financial penalty that makes somebody sit up, take notice, and stop violating the law, it's never going to happen.  So is that the remedy you seek?  What do you seek, Ms. Rosenfeld?  I need to get this on papers.  I need a decision.  If you don't like the remedy I impose, it's appealable, so appeal.  My talking is certainly not getting us anywhere.  I've been talking for four years and, before that, Judge whoever declared this statute unconstitutional. . . . Basically, the federal court has been ignored, both the district and the circuit.  Everybody's being ignored. . . .

The contempt will be granted and the fine will be imposed, and as far as the injunction, of course there has to be an injunction.  There's really been one for 15 years.

Ex. 11, Tr. at 9-11, Nov. 9, 2009.[1]

## ARGUMENT

## I.   THE CITY OF NEW YORK AND COMMISSIONER KELLY SHOULD BE FOUND IN CONTEMPT

It is well settled that the "'[t]he power to punish for contempts is inherent in all courts.'"  *Chambers v. Nasco, Inc.*, 501 U.S. 32, 44 (1991) (*quoting Ex Parte Robinson*, 19 Wall. 505, 510 (1874)).  The purpose of civil contempt, broadly stated, is to compel a reluctant party to do what a court requires of him.  *See Badgley v. Santacroce*, 800 F.2d 33, 36 (2d Cir. 1986). A party may be held in civil contempt for failure to comply with a court order if "(1) the order the contemnor failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner."  *Paramedics Electromedicina Comercial, Ltd. v. GE Med. Sys. Info. Techs.*, Inc., 369 F.3d 645, 655 (2d Cir. 2004); *King v. Allied Vision, Ltd.*, 65 F.3d 1051, 1058 (2d Cir. 1995).  "It need not be established that the violation was willful."  *Paramedics*, 369

---

[1] All references to "Ex. *" are to exhibits attached to the Declaration of Katherine Rosenfeld dated December 23, 2009 ("Rosenfeld Decl.").  References to the Declaration of J. McGregor Smyth, Jr., dated December 23, 2009, are to the "Smyth Decl., Ex. *".

6

F.3d at 655 (citation omitted).  Plaintiffs easily meet this test.

A.    **The Court's Orders Were Clear and Unambiguous**

An order is "clear and unambiguous where it is specific and definite enough to apprise those within its scope of the conduct that is being proscribed or required." *NBA* v. *Design Mgmt. Consultants, Inc.*, 289 F. Supp.2d 373, 377 (S.D.N.Y. 2003) (citation omitted).

After plaintiffs commenced the *Casale* case in March 2008, this Court ordered defendants Raymond W. Kelly and the City of New York to "abide by and reinforce" their self-professed "policy [which] prohibits enforcement of New York Penal Law § 240.35(3) and New York Penal Law § 240.35(7)." Stipulation & Order, May 2, 2008, docket entry #9 ("Stipulation & Order") ¶1. Notwithstanding the Order, defendants continued to routinely enforce the Statutes. Based on information defendants recently provided, it is clear that since May 2008, at least 71 different NYPD officers from 39 commands have issues 84 summons charging a violation of the Statutes, for an average of 4.67 summonses per month. Smyth Decl. ¶ 44. Similarly, on June 23, 2005, after the *Brown* case was commenced, this Court unequivocally instructed defendants to "cease enforcement" of § 240.35(1). Notwithstanding this order, since May 2007 when this Court denied contempt, at least 82 different NYPD officers from 46 commands have issues 96 summons charging a violation of that statute. Smyth Decl. ¶ 40. All told, at least 269 summonses for the Statutes have been issued in violation of these two Court Orders.[2] In fact, the pace of illegal summons prosecutions charging the Statutes has actually increased since May

---

[2] These numbers are conservative. Indeed, they unquestionably undercount the NYPD's enforcement of the Statutes. Just this week, defendants belatedly produced new information demonstrating even more instances of enforcement of the Statutes, including evidence of 31 recent summonses that do not appear anywhere in the NYPD's database and copies of which have never been produced to plaintiffs in discovery. Smyth Decl. ¶¶ 20-30.

2008.  Smyth Decl. ¶51, Ex. H.  There is no question that the Court's Orders prohibiting enforcement of §§ 240.35(1), (3) and (7) were clear and unambiguous, and that defendants routinely defied them.

### B.   Plaintiffs' Proof of Defendants' Noncompliance is Clear and Convincing

The standard of clear and convincing evidence requires the alleging party to demonstrate to "a reasonable certainty" that a violation occurred.  *See Levin v. Tiber Holding Co.*, 277 F.3d 243, 250 (2d Cir. 2002).  Plaintiffs handily meets this burden.  The data and evidence produced to plaintiffs by defendants and the court system establish that the NYPD continued to regularly enforce the void Statutes against hundreds of New Yorkers after the dates of this Court's Orders prohibiting such enforcement.  Smyth Decl. ¶¶10-51.  There can be no more clear and convincing proof of defendants' contempt that these undeniable facts.

### C.   Defendants Were Not Reasonably Diligent in Attempting to Comply

Defendants have not made reasonably diligent efforts to comply with the Court's Orders.  They should be found in contempt.  *See Powell* v. *Ward,* 643 F.2d 924 (2d Cir. 1981); *see also US  v. Yonkers,* 856 F.2d at 447-451 (district court rejected two motions for contempt, and threatened numerous "warnings" of contempt, before finally holding defendants in contempt).  Civil contempt "includes failures in meaningful respects to achieve substantial and diligent compliance." *Aspira* v. *Bd. of Educ.*, 423 F.Supp. 647, 649 (S.D.N.Y. 1976).

As a threshold matter, the bare statistical numbers - hundreds of summonses issued in violation of multiple court orders in two certified federal class actions - demonstrate that defendants have not diligently attempted to comply with the Orders.  While one might excuse a random mistake or two, here, *defendants have charged hundreds people.* Smyth

8

Decl.,¶¶ 40, 44, 48, 49; Ex. F-H.  The City cannot claim that it took "energetic steps" to ensure that the Order was followed.  *See Babee-Tenda Co.* v. *Scharco Manu. Co.,* 156 F. Supp. 582, 587 (S.D.N. Y. 1957).  And, as the official ultimately responsible for achieving compliance, defendant Kelly is equally culpable for these failures.

In addition to the statistics, defendants' actions (or lack thereof) also speak volumes.  In 2007, defendants narrowly escaped contempt in *Brown v. Kelly*, when this Court described defendants' extensive failure to "take the reins" on monitoring their own compliance with the Court's order to cease enforcement.  *Brown I*, at *2.  At that juncture, defendants had enforced the Statute more than seven hundred times after they were sued, and failed to institute any remedial measures until a contempt sanction loomed.  Notwithstanding these findings, the Court denied plaintiffs' motion for contempt because the Court accepted defendants' evidence of renewed, more vigorous actions to end enforcement.  Today, the Court is faced with a strikingly similar record to the record before it in *Brown I*, where defendants "went through the motions of carrying out the specific remedial measures," *id.* at *3, but not one iota more.

1.  **Defendants Did Nothing to Monitor or Halt the NYPD's Widespread Use of "Cheat Sheets" Until Plaintiffs' Counsel Uncovered the Problem and Threatened Contempt**

In October 2009, plaintiffs undertook a series of expedited depositions of NYPD police officers who had recently issued unconstitutional summonses in order to identify the reason that the NYPD had issued hundred of summonses for the Statutes since the *Casale* lawsuit was commenced in May 2008.

At the very first deposition taken on October 1, 2009, the officer (PO Burke) revealed that he had referred to a "cheat sheet" before he issued a summons for § 240.35(3).  Ex.

5 (PO Burke) at 50-51 (cheat sheet is a "non department forms that guys usually make up for summonses."). As plaintiffs now understand, "cheat sheets" or "Master C Summons Lists" are unofficial lists of summonsable offenses carried by many NYPD officers inside their official NYPD summons books – often written and distributed informally amongst police officers – that NYPD police officers use in the field to determine what charges to issue in a summons.  Ex. 8.

At subsequent depositions, multiple officers confirmed that they carried the cheat sheets on patrol, and had issued summonses for the unconstitutional Statutes after consulting their cheat sheets.  Of the five police officers that plaintiffs deposed in October 2009 (who were chosen essentially at random from the hundreds of officers who have recently enforced the Statutes), four of the five officers carried cheat sheets and relied on them in writing the unconstitutional summonses.[3]

All of the officers recently deposed in this case who possessed a cheat sheet were carrying the cheat sheets at their depositions in October 2009, with the unconstitutional statutes still written on the sheet.  Their depositions occurred many months after the date that the officers had issued the void summonses.  In the intervening months, long after this lawsuit was filed, the NYPD had never reviewed or redacted their cheat sheets.

The use of cheat sheets within the NYPD is obviously longstanding and widespread.  *See* Ex. 4 (PO Dowe) at 41:19-42:9, 72:11-16 (estimating that approximately 70%

---

[3] Ex. 4 (PO Dowe) at 39:2-7 ("I was looking at this sheet to find an appropriate charge that I felt went with the nature of the offense, which I stumbled upon the 240.35, subsection 3, I believe."); Ex. 5 (PO Burke) at 50:19-23 ("I referred to, what's called cheat sheets, to provide a summons statute to write on the summons."); Ex. 6 (PO Nazario) at 43, 101-02 (consulted his Master C Summons List to find "a code that seemed relevant to the situation at hand"); Ex. 7 (PO Pereira) at 33-34 (same); Ex. 15 (NYPD report documenting that officer who issued a summons for § 250.35(3) carried a cheat sheet).

of officers in his command use the cheat sheets); Ex. 5 (PO Burke) at 58-59 ("standard practice" to consult cheat sheets); Ex. 6 (PO Nazario) at 130.  Cheat sheets are being used with the full knowledge and acquiescence of NYPD supervisors, who are tolerating their officers' longstanding reliance on constitutionally defective and inaccurate lists.  Ex. 7 (PO Pereira) at 128 (consulted his Master C Summons List in presence of his supervisor, in order to issue summons for § 240.35(3) – "He was aware that I had that sheet on me.").

On October 29, 2009, plaintiffs wrote to defendants and demanded that they act to halt the continuing enforcement of the unconstitutional Statutes, or face this motion.  Ex. 9. Plaintiffs specifically requested that defendants require all NYPD commanding officers to personally review the "cheat sheets" of all individual police officers in order to delete all unconstitutional charges from the cheat sheets, and to record the results of that review for reporting to plaintiffs.  Plaintiffs also requested that defendants ensure that for every future enforcement incident, a supervisor investigate whether the officer relied on a "cheat sheet," to physically inspect and redact the document, and to also report the results of these reviews to plaintiffs on a monthly basis.

On November 13, 2009, defendants tentatively agreed to undertake a selection of the measures suggested by plaintiffs, including a proposed version of the inspection and review of the "cheat sheets."  Rosenfeld Decl., ¶ 29.  After plaintiffs demanded review and production of all cheat sheets, however, defendants took the obstructionist position that they were not obligated to preserve or produce these plainly relevant documents.  Plaintiffs then sought a preservation order from the Court.  Ex. 13.  Consistent with their prior foot-dragging, defendants opposed the application, and argued that the cheat sheets were not relevant or discoverable.  On December 9,

2009, the Court ordered defendants to preserve the cheat sheets, to produce to plaintiffs any sheet that contained the Statutes, to disseminate immediate notice of a review process to all NYPD officers, and to complete this review by a date certain. Ex. 14, Tr. at 26-30, Dec. 9, 2009.

The NYPD's widespread use of "cheat sheets" is a major factor in the ongoing enforcement. Predictably, until plaintiffs conducted these depositions in October 2009 and uncovered the problem, the NYPD had done nothing to address it. Had defendants taken seriously their obligation to halt enforcement of the Statutes, the NYPD would have reviewed the cheat sheets many years prior to December 11, 2009. Defendants were not reasonably diligent in attempting to root out a key reason that enforcement of the Statutes was continuing.

### 2.  Defendants Did Not Inspect Penal Law Copies in Precinct Libraries to Confirm Deletion of the Statutes Until Threatened with Contempt

According to hundreds of pages of documents produced by defendants on December 18, 2009 (three business days before the filing of this motion), defendants waited until October 19, 2009 to conduct a systematic survey of all NYPD precinct libraries in order to ensure that the Statutes were deleted from their copies of the New York Penal Law. Via a FINEST message dated April 21, 2008, and again on June 3, 2009, the NYPD had previously ordered that all copies of the Penal Law maintained in all NYPD commands were to be redacted to omit the Statutes, by drawing a black line through the sections in the penal law book. Rosenfeld Decl. ¶ 14.

After sending out these messages, the NYPD never bothered to confirm whether this in fact had been done, at least until the latest threat of contempt arose. At least one police officer testified that he consulted the penal law book in his command after he issued the summons in question, for the purpose of clarifying the status of the law, and that he found the

-12-

subsection therein.  Ex. 5 (PO Burke) at 71:4-5.  In October 2009, the NYPD apparently started a

library-by-library review, which revealed that dozens of commands still contained copies of the

Penal Law with the Statutes unredacted therein, in violation of the orders in the prior two

FINEST messages.  Rosenfeld Decl. ¶ 23.

### 3.  Defendants Did Not Meaningfully Train or Discipline Police Officers Until Faced with Contempt

Since the Court's ruling in *Brown I*, and after this Court's Order in *Casale*,

defendants sent out a FINEST message within the NYPD directing that officers cease

enforcement of the Statutes, and instituted a cursory training and discipline program in 2008.

This program was perfunctory and resulted in little or no meaningful corrective action against

officers or the responsible supervisors.  Following these initial steps, defendants sat back and did

absolutely nothing else to prevent enforcement of the Statute for more than a year and a half.

The training provided by the NYPD regarding the Statutes was superficial and

ineffective.  Many officers were either not trained at all, or were so minimally trained that they

could not even remember if they received the training.  Ex. 6 (PO Nazario) at 25-26 (attended a

role call training on the Statutes before he issued a summons for the Statutes); Ex. 4 (PO Dowe)

at 69 ("It is possible I was trained, but not that I recall."); Ex. 12 (PO Elhaddad) at 96-97 (same);

Ex. 15 (same).  Those officers who did receive training described a perfunctory process held at

roll call at the end of the tour, a time when officers sometimes complete paperwork.  Ex. 6 (PO

Nazario) at 77.  One officer correctly stated that he had not received sufficient training about the

unconstitutionality of the Statutes as of the date he issued the summons for § 240.35(3)

"[b]ecause, if it was sufficient, I would have recalled and not written the summons."  *Id.* at 126.

Starting in mid-2008, defendants apparently issued an automatic "Schedule A command discipline" to officers who wrote summonses for the unconstitutional Statutes. No written policies or procedures governed this process. Almost inconceivably, prior to discipline, defendants never inquired of the officers *why* they had written summonses for the Statutes, where they had learned of the Statutes or any other relevant information that one would acquire if conducting a real investigation. Ex. 4 (PO Dowe) at 69:3-5 (lieutenant did not ask how officer knew to write the charge down for § 240.35(3)); Ex. 5 (PO Burke) at 70:2-8 (investigating sergeant never asked why officer issued summons for this offense, if he used a cheat sheet, or to review his summons book); Ex. 12 (PO Elhaddad) at 93-96 (no supervisor inquired where he got the code or why he used subsection); Ex. 6 (PO Nazario) at 66-68 (supervisor told him in "passing" that the summons was unconstitutional and of discipline, but did not ask him for the source or if he used a cheat sheet). Defendants' implementation of the program and their conduct overall can most charitably be described as lackadaisical. Certainly, no one cared whether the program actually worked.

It was not until October 2009, again facing contempt, that defendants were roused to introduce a new disciplinary program whereby the Internal Affairs Bureau of the Police Department would oversee investigations into all summons issued under the Statutes. Under this iteration, the NYPD will apparently issue "Schedule B" command disciplines requiring the loss of vacation time as a sanction to officers who issue a summons under the Statutes. (Prior to this recent change, the NYPD was issuing "Schedule A" command disciplines that had no real sanction attached and did not result in the loss of any vacation time.)

Defendants could not seriously or in good faith have believed that conducting brief roll call training and issuing *post-hoc* discipline (with no attached sanction beyond the fact of the discipline itself) were adequate measures to ensure compliance with this Court's Orders. As it became evident that officers continued to enforce the Statutes, defendants made no efforts to explore why their "program" was failing. This is the antithesis of "reasonable diligence." It was not "reasonable" to continue to rely upon a plan after 200 invalid summonses were issued. "Such passive indifference is suggestive of contempt." *Brown I* at *4.

### 4. Defendants Obstructed Discovery In Order to Prevent Oversight of the NYPD and Tracking of the Ongoing Enforcement

Just as in *Brown I*, here too, defendants have "engaged in months of stonewalling," and "shrugged their shoulders at plaintiff's repeated requests for hard copies of the unlawful summonses." *Id.* at *4. For many months after *Casale* was filed, plaintiffs repeatedly requested that defendants produce paper copies of the unconstitutional summonses that contained the narrative description of the alleged conduct (rather than require plaintiffs to rely only on the NYPD's monthly electronic reports purporting to summarize enforcement activity that were generated by NYPD personnel and sporadically produced to plaintiffs). Defendants refused to produce paper copies of the summonses, or even to produce the monthly electronic data updates in a timely fashion. Rosenfeld Decl. ¶¶ 15-18, 20, 25.

When defendants finally produced hard copies of the summonses, they unilaterally redacted critical information and refused to provide unredacted copies. Plaintiffs were forced to contact the Court, and only then did defendants act. *See* Ex. 10 ("[W]ith respect to plaintiffs' request for the un-redacted copies of summonses from defendants' September 18 and October 12, 2009 production, *this afternoon*, defendants provided plaintiffs will [sic] copies of these

-15-

summonses in un-redacted form.") (emphasis added). Such gamesmanship by defendants has unfortunately typified discovery in this case. Most importantly, defendants' tactics betray their overall disinclination to take meaningful actions to cease enforcement.

In November 2009, defendants disclosed for the first time that they had lost six months of hard copies of summonses issued for the Statutes. Ex. 11, Tr. at 4, Nov. 9, 2009 ("there is approximately six-month time frame that we cannot locate those hard copies from.") In response to this revelation, the Court indicated it would be inclined to make an adverse inference against defendants in light of the missing documents. *See id.*, Tr. at 13, Nov. 9, 2009 ("So any summons on or before September 18 must be produced by November 18, or it will be considered part of the contempt and for adverse inference request. Once you're 60 days out, there's no further excuse."). With the Court's sanction looming, defendants suddenly produced thousands of pages of responsive documents, on the very last date of the Court's deadline. Rosenfeld Decl. ¶¶ 28, 31 (defendants' email to OCA stating that "there is *now* a pressing need because of an order issued by Judge Scheindlin to track down the hard copies of summonses for these subsections from June 2007 to present.") (emphasis added). Defendants have still been unable to find copies of at least 34 summonses that the NYPD issued for the Statutes, a failure which is the subject of plaintiffs' concurrent motion for discovery sanctions. *See infra* at III.

Consistent with these stonewalling tactics, defendants also refused to preserve and produce the "cheat sheets" that provide critical evidence of their liability, again necessitating a letter motion by plaintiff to the Court and a court appearance, at which time this Court again ordered defendants fulfill their obvious discovery obligations. Ex. 14, Tr. at 25-26, Dec. 9, 2009 ("They're entitled to know how many people are walking around with cheat sheets with this

statute, so it's only the page that has 240.35 that they have to collect, photocopy, put in an

envelope, noting at the top the date of inspection, the officer who did the inspection and the

officer's name, see what they get.  Does that do it, Ms. Rosenfeld?").

      Most recently, this past Friday, December 18, defendants inexcusably produced

close to 400 pages of discovery, months (and sometimes years) late, and right before plaintiffs

were scheduled to conduct a critical Rule 30(b)(6) deposition on the following Monday morning.

All of these documents were responsive to plaintiffs' *four* prior discovery demands, not to

mention defendants' continuing obligation to supplement discovery responses.  The documents

reveal that NYPD had either erroneously entered or failed to enter at least 31 summonses issued

for the Statutes in violation of this Court's Orders.  Of course, these 31 summonses were never

produced to plaintiffs.  Smyth Decl. ¶¶ 20-33.

### 5.    Defendants Consistently Fail to Act Unless Faced With Contempt

      In opposition to this motion, defendants will argue that they have recently acted to

stop the ongoing enforcement of the Statutes, and so contempt should be denied.

      First, at some point in late 2008 after the *Casale* action was filed, defendants

introduced a program of officer training and *post hoc* discipline for police officers who had

issued summonses for the Statutes.  Notably, defendants introduced this program (at least to

plaintiffs) literally minutes before a court conference on May 6, 2009, at which plaintiffs

intended to present evidence to the Court of continued enforcement of the Statutes.[4]  Essentially,

---

[4] Ex. 3, Tr. at 4, May 6, 2009 appearance ("what we've talked about with the city is if there is any last-ditch effort to avoid that [contempt] motion, in the sense that we were not aware that the city had undertaken any remedial measures.  We had received no information about them in either case.  In meeting before this appearance with the defendants, we understand that they did start a program to do some sort of counseling with officers who issued these summonses . . .").

in May 2009, faced with evidence of ongoing enforcement and in order to avoid contempt, defendants presented a "discipline and training plan" to plaintiffs on the courthouse steps. No documents describing the written procedures and policies that govern its implementation, or the identity of its supervisors and designers, exist or have ever been produced to plaintiffs in this litigation. Implementing a department-wide policy of discipline without written policies and procedures holding identifiable individuals accountable for its operation would seem to predetermine that this program would fail, and it inevitably did.

Following the initiation of the NYPD's discipline program in mid-2008, and not surprisingly – since no real investigations of the circumstances underlying the summons issuance were ever conducted, no supervisory-level discipline was introduced, no written procedure governed the program's operation, and many precinct-level copies of the penal law containing the void laws remained unaltered – enforcement of the Statutes continued. Although it was immediately clear that the NYPD's training and *post hoc* discipline program was not working, defendants did nothing. Rosenfeld Decl., ¶ 8 ("whatever 'plan' the City claims to have adopted in the wake of these lawsuits is not working" since "more than 150 summonses have issued since this Court's contempt ruling in *Brown* in May 2007.") Each month, as new statistics of new officers issuing new illegal summonses rolled in, defendants took no new corrective actions.

In contrast to defendants' inaction, plaintiffs were able to uncover one significant reason for the ongoing enforcement by taking five depositions in October 2009. These depositions revealed that enforcement continued largely because many NYPD officers carry "cheat sheets" which list the unconstitutional Statutes and rely on these cheat sheets when issuing summonses for the Statutes. As a result of plaintiffs' discovery efforts – and as in *Brown I*, only

-18-

when faced with the prospect of contempt – defendants have hurriedly introduced a series of remedial measures in the past two months.  These measures should have been in place for years, but inexplicably they were not instituted until October 2009.

In particular, defendants' "cheat sheet" review program only came about because this Court and plaintiffs insisted upon it, and plaintiffs went to the Court (over defendants' objections) to request a court order requiring it.  Rosenfeld Decl. ¶ 35 (stating that defendants were "considering" a program to review cheats sheets, and complaining of burden associated with plaintiff's request that the NYPD "review and delet[e] the loitering subsections from each individual 'cheat sheet'.").  Only when plaintiffs' counsel investigated and identified the cheat sheets as a significant contributing factor to the continuing enforcement did defendants act. Defendants' refusal to implement even the simplest methods of investigating the use of cheat sheets exposes a willful and reckless disregard for the rights of the innocent people who were charged with violating a void law.  They should be found in contempt.

Defendants have accomplished nothing in these cases since 2007 except when pressured and threatened by plaintiffs and the Court.  These facts are identical to defendants' conduct in 2005 and 2006, prior to the contempt proceeding in *Brown*, where again, defendants did nothing for years and only when plaintiffs moved for contempt, did defendants begin to act. *Benjamin v. Fraser*, No. 75 Civ. 3073, 2002 WL 31845111, at *7 (S.D.N.Y. Dec. 16, 2002) ("last-ditch efforts to comply" are insufficient); *see also Benjamin v. Sielaff*, 752 F.Supp. 140, 147 (S.D.N.Y. 1990) (it "is reasonable to believe that the procedures now in place could have been invoked earlier.  The sequence of events demonstrates that the situation could have been taken in hand when it first surfaced.").

-19-

In 2007, this Court denied the contempt sanction because it found that such sanctions would not " have the desired effect of halting the issuance of further summonses by patrolling officers," *Brown I* at *5, and thus would be impermissibly punitive. Three years later, it is clear that the efforts of defendant Commissioner Kelly and top-level NYPD supervisors have not been truly focused on this problem, perhaps because the majority of those charged under these Statutes are poor, powerless, or marginalized individuals. In particular, § 240.35(3) has traditionally been used to target gay men suspected of "cruising," and to the extent that individuals suspected of "deviant" sexual misconduct continue to be charged, an additional barrier of social stigma may prevent those individuals from resisting or complaining.

Defendants' recent frenzy of activities in October and November 2009 prove too much. *See Benjamin v. Fraser*, 2002 WL 31845111, at *7 (correction department's " 'eleventh-hour' attempts at compliance" failed to save the department from contempt). Defendants' newfound zeal in addressing their illegal actions occurred in the immediate aftermath of plaintiffs' counsel's pressure, investigation, and demand for action. Defendants' spurt of activity on the heels of plaintiffs' motion for a finding of contempt, *see Aspira v. Bd. of Educ.*, 423 F. Supp. 647, 654 (S.D.N.Y. 1976), cannot save them from the consequences of their previous indifference. If anything, defendants' actions serve to drive home the fact that defendants easily could and should have complied with this Court's Orders years ago.

**D.      The Court Should Impose Civil Sanctions on Defendants**

A sanction imposed on a party held in civil contempt may serve either or both of two purposes: to coerce the contemnor into complying in the future with the court's order, or to compensate the complainant for losses resulting from contemnor's past noncompliance. *See*

*Perfect Fit Indus., Inc. v. Acme Quilting Co., Inc.*, 673 F.2d 53, 56 (2d Cir. 1982); *New York State Nat'l Org. for Women v. Terry,* 886 F.2d 1339, 1351, 1353 (2d Cir. 1989) (hereinafter "NOW 1989"). District courts have "virtually unreviewable discretion" in levying civil contempt sanctions. *Simkin v. United States*, 715 F.3d 34, 38 (2d Cir. 1983).

Sanctions for "indirect" civil contempt - contempt resulting from actions occurring outside the courtroom - may be imposed "in an ordinary civil proceeding upon notice and an opportunity to be heard." *Int'l Union, United Mine Workers of America v. Bagwell*, 512 U.S. 821 (1994). Sanctions for "indirect" civil contempt are designed specifically to compel future compliance with a court order and are avoidable through compliance. *Id.* at 828 (contemnor must have the opportunity "reduce or avoid the fine through compliance."). A court may impose a fine as a sanction only if "the contemnor is able to purge the contempt . . . by committing an affirmative act, and thus carries the keys of his prison in his own pocket." *ACLI Gov't Securities, Inc. v. Rhoades*, No. 81 Civ. 2555 (SAS), 1995 WL 731627, at *3 (S.D.N.Y. Dec. 11, 1995).

In assessing sanctions for civil contempt, the trial court has "wide discretion in fashioning a remedy." *Weitzman v. Stein*, 98 F.3d 717, 719 (2d Cir. 1996) (citation omitted); *see also Titra Cal., Inc. v. Titra Film*, No. 98 Civ. 0234, 2001 WL 1382587 at * 3 (Nov. 6, 2001 S.D.N.Y.). The district court is counseled to consider several factors in calculating a fine, including "the character and magnitude of the harm threatened by continued contumacy," the "probable effectiveness of any suggested sanction in bringing about [compliance]," and the contemnor's ability to pay. *See Paramedics*, 369 F.3d at 657-58. "The ultimate consideration is whether the coercive sanction - here, a fine - is reasonable in relation to the facts. That

-21-

determination is left to the informed discretion of the district court." *NOW 1989*, 886 F.2d at 1353 (internal citations omitted); *see also In re Grand Jury Witness*, 835 F.2d 437, 443 (2d Cir. 1998). According to the Second Circuit, "a financial penalty may be the most effective means of insuring compliance" if a city refuses to adhere to a court order. *See United States v. Yonkers*, 856 F.2d at 458 (citation omitted).

Here, as sanctions for defendants' civil contempt, plaintiffs request a coercive sanction of $5,000 for each prospective violation of the Orders, payable to the Court, with a "purge" provision permitting defendants to avoid contempt and fines if they file and publish, within 60 days, an affirmation of their intention to abide by the Order, and then abide by it. As an additional aspect of the "purge" provision, plaintiffs propose that the Court suspend the imposition of the fines for a period of six months from the date of any Order issued, so that defendants are given an additional "grace period" in which to comply with the Court's Orders before financial penalties are assessed.

At this juncture, a per enforcement sanction of $5,000 would undeniably focus the sustained attention of the highest level of the NYPD on this problem. If five unconstitutional summonses are issued next month, and the NYPD faces $25,000 in fines (albeit suspended), the reason for these summons issuance will be thoroughly investigated, and that every conceivable step will be taken to avoid a repeat. Given defendants' long history of non-compliance, this is the paradigmatic case where the imposition of prospective sanctions would truly serve a coercive rather than punitive purpose. Defendants have demonstrated time and again that nothing less than the prospective threat of immediate and severe consequences will motivate them to comply with this Court's Orders.

In short, if defendants conform their conduct to the Court's Order and publicly affirm their intention to do so, they will escape an obligation to pay fines. "It is therefore clear that punishment for past wrongdoing is not the objective of the fines, but rather coercion of the defendants to conform their conduct to the court's order." *NOW 1998*, 159 F.3d 86, 95 (2d Cir. 1998); *United States v. United Mine Workers*, 330 U.S. 258 (1947) (union could avoid paying $2.8 million fine if it fully complied with district court's temporary restraining order); *Playboy Enterprises, Inc. v. Chuckleberry Publishing, Inc.*, 939 F.Supp. 1032, 1041 (S.D.N.Y. 1996) (SAS); *Commodity Futures Trading Comm'n v. Cohen*, 284 F.3d 404, 406 (2d Cir. 2002); *Bagwell*, 512 U.S. at 829. The City may avoid the sanctions if it complies with the Court's Order. Thus, the City holds "the proverbial key to [its] prison." *ACLI*, 1995 WL 731627, at *4.

In addition to civil sanctions described above, plaintiffs are entitled to attorneys' fees because defendants' conduct was willful. A "willful contempt is one where 'contemnor had actual notice of the court's order, was able to comply with it, did not seek to have it modified, and did not make a good faith effort to comply.'" *E.E.O.C. v. Local 638*, 889 F.Supp. 642, 670-71 (S.D.N.Y. 1991) (citation omitted). Plaintiffs should be awarded attorneys' fees.

## II.   PRELIMINARY INJUNCTIVE RELIEF SHOULD BE ORDERED

Plaintiffs seek an order preliminarily enjoining defendants to take specific remedial steps to halt enforcement of the Statutes once and for all. Plaintiffs' motion should be granted. To obtain a preliminary injunction, plaintiff need only "show, first, irreparable injury, and, second, either (a) likelihood of success on the merits, or (b) sufficiently serious questions going to the merits and a balance of hardships decidedly tipped in the movant's favor." *Green Party v. New York State Bd. of Elections*, 389 F.3d 411, 418 (2d Cir. 2004).

Here, the plaintiff classes will suffer irreparable injury if the defendants are not ordered to finally take meaningful action to halt enforcement of the Statutes. Absent a targeted remedial injunction, members of the plaintiff classes face being subjected to the continuing violation of their First, Fourth, Fifth, and Fourteenth Amendment constitutional rights, including their right to be free from criminal enforcement of an unconstitutional law. The former lead plaintiff in *Brown v. Kelly*, Eddie Wise, was himself issued a new summons for § 240.35(1) as recently as October 2009. *See* Smyth Decl., ¶ 17, Ex. A. Violation of a constitutional right is considered "irreparable harm." *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir.1996) ("The district court . . . properly relied on the presumption of irreparable injury that flows from a violation of constitutional rights."); *see also Charette v. Town of Oyster Bay*, 159 F.3d 749, 755 (2d Cir. 1998) (same). Plaintiffs will also prevail on the merits of their claims that defendants' conduct violated their constitutional rights. It is already established by multiple courts, and conceded by defendants in this case, that defendants' enforcement of unconstitutional loitering laws is prohibited, and subjects defendants to liability for the violation of the plaintiff class's rights.

Plaintiffs seek a preliminary injunction that requires the NYPD to take the following steps:

1.  Pursuant to a written policy, and within the thirty days of the Court's Order and thereafter on an annual basis, the NYPD should require all Commanding Officers to personally review the "cheat sheets" or "Master C Summons Lists" carried by his/her officers in order to delete all unconstitutional charges from these sheets. The results of the reviews should be reported to plaintiffs monthly and included as additional data fields in the monthly reports of recent enforcement activity. The results of the annual cheat sheet review should also be logged into the NYPD's COGNOS database table of all members of service (MOS). The NYPD should promulgate a written policy that prohibits officers from carrying "cheat sheets" containing the Statutes, requires annual cheat sheet reviews by supervisors, and provides for discipline in the event of a violation.

Officers' use of unofficial "cheat sheets" containing the Statutes is a significant contributing factor to the current enforcement. After plaintiffs moved the Court for relief on December 1, 2009, defendants commenced an initial review of all "cheat sheets" carried by NYPD officers. Rosenfeld Decl. ¶ 37 ("The Department is undertaking a review of all compilations pursuant to a court order, after which the compilations will be returned to officers."). The NYPD's court-ordered review undertaken last week should not be the end of this process. The NYPD must conduct a similar "cheat sheet" review on an annual basis. The results of this cheat sheet review should be logged into the NYPD's COGNOS system to create a specific record of which officers carried a cheat sheet containing the unconstitutional Statutes, so this data can be linked and tracked on a long-term basis with future enforcement incidents. Entering the results of the cheat sheet review into COGNOS, and reporting it to plaintiffs, will ensure that compliance actions are tagged to individual NYPD personnel. The NYPD should also promulgate a written policy stating that the NYPD will not tolerate reliance on outdated "cheat sheets," providing consequences to officers who violate the policy, and require supervisors to conduct an annual cheat sheet review, and provide specific consequences to supervisors who violate the policy.

2. Pursuant to a written policy, and within the thirty days of the Court's Order, for every future enforcement incident, the NYPD should require the supervisor conducting the investigation to ask the MOS whether he or she has a personal "cheat sheet" of summonsable offenses and to physically inspect any such document and redact any entry related to the Statutes. The results of the reviews should be reported to plaintiffs monthly and included as additional data fields (attached to the relevant MOS) in the monthly reports of recent enforcement activity. Documentation should also be included in any internal memoranda or discipline regarding the incident.

In the last few months – and again, only when faced with the prospect of a

contempt sanction – the Internal Affairs Bureau of the NYPD has apparently begun to investigate each summons issued under the Statutes, and to issue "Schedule B" command disciplines to officers who issue summonses for the Statutes.  To plaintiffs' knowledge, no written policies govern IAB's investigations, and there is no written requirement that IAB investigate whether a cheat sheet was used.  In fact, the recent report authored by the IAB detective currently assigned to investigate the summonses fails to even state whether the officer's cheat sheet contained the void charge.  Ex. 15 ("Police Officer Regnier had a "cheat sheet" (penal law code) which is available in the 083 precinct to refer to as a guide.").

    The NYPD must investigate and discipline officers when summons are issued under the Statutes pursuant to written policies that require specific, concrete steps.  Written policies for investigation and discipline ensure consistent application across all commands, and allow for accountability in the event that the policies are not carried out.  Written policies also provide advance notice to members of the NYPD (consistent with basic fairness), provide greater transparency to defendants' actions, and allow plaintiffs and this Court to monitor defendants' conduct and compliance.

3.  Pursuant to a written policy, and within the thirty days of the Court's Order, the NYPD should issue discipline for the issuance of summons under the Statutes, and should issue discipline for recurrent summons issuance at a higher level than only to the issuing officer, such as to the Training Sergeant and Commanding Officer of any precinct where multiple unconstitutional summonses are issued in any given quarter.

    Over the last two months, it appears that the NYPD is disciplining issuing officers with a Schedule B command discipline and loss of vacation time.  To plaintiffs' knowledge, there is no written policy that governs the operation of this program, which of course prevents accountability, transparency and consistency in its application.  In any event, the NYPD's focus

on disciplining individual officers is insufficient. Supervisors share responsibility for enforcement, both at the level of Training Sergeants who fail to properly train officers, and at the level of Commanding Officers who have not adequately supervised their officers.

By focusing its discipline to date solely on individual officers, the NYPD has attempted to shift blame onto the officers for what are in fact the systematic failings of the NYPD. In particular, the NYPD has disciplined officers for issuing summonses, despite the fact that these officers were never trained regarding the unconstitutionality of the Statutes. Ex. 5 (PO Burke) at 72-73, 75:15-20 ("Before the incident, no, I was not trained, that I can recall specifically, no."). More egregiously, some officers who were disciplined actually issued the invalid summonses in the presence of, or at the direction of a supervisor, yet only the officer was subsequently disciplined. Ex. 7 (PO Pereira) at 33:5-7 ("[supervisor] said 'Write the summons for loitering for sexual activity,' and then he explained why."). Individual officers are being scapegoated for a problem that should be addressed at a higher level of command responsibility.

Similarly, with respect to the deletion of the Statutes from penal law copies maintained in libraries, the NYPD previously instructed Commanding Officers to ensure compliance. Rosenfeld Decl. ¶13. Commanding Officers obviously failed to act, but no discipline ensued. A written policy should provide for mandatory discipline of a Commanding Officer and Training Sergeant in the event of multiple summonses issued for the Statutes from his/her command in a given quarter. By re-focusing the disciplinary process on supervisors, the Court will correct the current imbalance and create stronger incentives for supervisors to train and supervise officers regarding the Statutes.

       4.      Pursuant to a written policy, and within the thirty days of the Court's Order, in commands where illegal summonses have issued in the last six

months, the NYPD should require all officers to sign an "acknowledgment" form when officers collect either a new "book" of summonses, or a new memo or log book, stating that they understand that the Statutes are unconstitutional.

5.     Within the thirty days of the Court's Order, the NYPD should revise the monthly activity report where MOS tally their arrests and summonses to include a prominent warning that enforcement of the Statutes is illegal. Pursuant to a written policy, and within the thirty days of the Court's Order, the NYPD should require supervisors completing the ratings for MOS on this report to deduct points if the MOS conducts any enforcement activity under the Statutes in the relevant time period.

The NYPD must weave solutions to the enforcement problem into the actual workflow of individual police officers. Accordingly, the NYPD should require officers to sign acknowledgement forms at the collection point for new summons books, and make changes to the Monthly Activity Report.[5] At his deposition, Officer Dowe confirmed that such a reminder would be useful. Ex. 4 at 80:16-20 ("In my opinion, hypothetically, if I was the supervisor, I would propose that before you sign out a book of summonses, a copy of unconstitutional law, invalid summons codes should be issued with the booklet of summonses."). These steps would integrate a warning not to issue summonses for the Statutes directly into the officers' current practices. The change to the Monthly Activity Report would weave the consequence for issuing the summonses directly into the officer's normal monthly reporting practices and evaluations.

6.     Pursuant to a written policy, the NYPD should conduct an annual review to ensure that all commands have in fact redacted the Statutes from all paper and electronic copies of the Penal Law in their possession, as they were apparently required to do by a recent FINEST message, and provide plaintiffs with a list of confirmed redactions including the command, location within the command, and date redacted.

---

[5] Officers complete a Monthly Activity Report at the conclusion of every month, and in it they tally their total summonses and arrests for the month, before presenting it to a supervisor for review and signature.

In October 2009, eighteen months late, the NYPD apparently conducted this review of precinct commands and discovered that many commands still contained copies of the Penal Law listing the void Statutes. The Court should order that this review be conducted on an annual basis so that no NYPD command contains a copy of the penal law without the void Statutes being redacted.

7. Within sixty days of the Court's Order, the NYPD should create and distribute a single page insert for the summons books carried by NYPD officers listing all New York Penal law statutes deemed unconstitutional and unenforceable.

8. Within sixty days of the Court's Order, the NYPD should consult with graphic design experts and MOS in the field, and based on their recommendations, the NYPD should revise the "Common Summonsable Offenses" insert placed in current NYPD summons books in order to make the insert more user-friendly and visually accessible.

Deposition testimony established that officers are using the cheat sheets, Ex. 8, rather than the official NYPD inserts listing "common summonsable offenses" that are intended for use in summons books, because the cheat sheets are more user-friendly for officers on patrol. Police officers apparently prefer to use the unofficial cheat sheets because they "streamline our process of writing summonses" and the sheets are perceived as a "more condensed, thorough version to use than official NYPD forms." Ex. 5 (PO Burke) at 51, 55. For ease of reference, the NYPD should create a single page insert for use in officers' summons books that lists all unenforceable provisions of the New York Penal law. In addition, with guidance from graphic design experts and police officers, the NYPD should revise the official NYPD "summonsable offense" inserts to create a more user-friendly document that would encourage officers to use the official inserts rather than error-prone unofficial lists.

In opposition, defendants will argue that a preliminary injunction is unnecessary

-29-

because defendants have recently agreed to take some of the steps (or versions thereof) that plaintiffs propose. Defendants' argument must be rejected. First, defendants will not voluntarily agree to take all of the proposed remedial steps (and it was this divergence that necessitated this motion). Second, defendants' voluntary promises to change their ways are no longer good enough. Any remedial plan adopted at this late date of these litigations must be court-ordered, mandatory, verifiable, and subject to review and assessment by plaintiffs and the Court. Third, defendants' voluntary proposals for remedial steps have never included any firm timetable. There must be firm, court-ordered deadlines set for defendants' completion of these tasks. Fourth, defendants' enforcement of the Statutes is ongoing, and will extend into the future: the remedial relief imposed by the Court should likewise continue into the foreseeable future to ensure compliance. Otherwise, when the focus created by this motion shifts away, defendants will cease paying attention to the problem and to their own obligations. Finally, defendants' proposed remedial plan does not include creating written policies to govern implementation, and does not include monitoring and reporting results to plaintiffs. Both of these aspects are *absolutely critical* to the success of any remedial plan, and must be court-ordered.

## III.    THE CITY VIOLATED ITS DUTY TO PRESERVE EVIDENCE

The City of New York failed to preserve hard copies of at least 34 summonses that the NYPD issued for the void loitering subsections from June 2007 to date. Smyth Decl. ¶¶ 20-30.

A party is under a duty to preserve documents that are relevant to litigation. *See Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 218 (S.D.N.Y. 2003) ("Once a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in

place a "litigation hold" to ensure the preservation of relevant documents"). Here, that duty

arose in at least January 2003 (and really as early as 1992), when the City of New York was sued

by an individual wrongfully arrested for § 240.35(3), and the City subsequently compensated that

individual to settle the case. Defendants' duty to preserve evidence had certainly arisen by June

2005, when *Wise/Brown* was commenced, and by March 2007, when counsel for the City of New

York asked the New York State Office of Court Administration ("OCA") to take action "on cases

charging unconstitutional subsections of Penal Law § 240.35." Ex. 1. Undoubtedly, that duty

existed as of June 19, 2007, when the NYPD's Chief of Patrol circulated a memo to all NYPD

commanding officers stating that the Statutes 240.35, subdivisions (1), (3) and (7) had been

declared unconstitutional and that officers were not enforce the Statutes. Ex. 2.

      Notwithstanding its longstanding obligation to preserve copies of all summonses

issued for the Statutes, the NYPD failed to preserve copies of at least 34 summonses. The

obligation to preserve documents is, of course, not the NYPD's alone: "[c]ounsel must oversee

compliance with the litigation hold, monitoring the party's efforts to retain and produce the

relevant documents." *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 432 (S.D.N.Y. 2004).

      Depending on the extent and circumstances of any destruction of documents,

defendants may be subject to sanctions including judgment by default, preclusion of evidence,

imposition of an adverse inference, or assessment of attorneys' fees and costs. Fed. R. Civ. P.

37(b); *see Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d 99, 106-07 (2d Cir.

2002).

      In this case, as a remedy, plaintiffs request that the Court draw an adverse

inference that for every one of the 34 (and perhaps more) summonses not produced by

-31-

defendants, the record would have revealed no legal basis for the summons being issued other than the violation of the unconstitutional loitering law. Defendants have destroyed or lost the hard copies of the summonses which contain the "narrative" section of the summons describing the alleged misconduct. Because the narrative sections are not available, the Court should infer that these narratives would not have been favorable to the City.

Defendants may argue that the obligation to preserve these records somehow belonged to OCA, and not to the New York City Police Department. This is simply wrong. Employees of the NYPD wrote and issued these summonses, in the context of an ongoing litigation against that entity for enforcing the Statutes. The summonses indisputably begin as NYPD documents, in the possession, control and custody of the NYPD. *See* Ex. 11, Tr. at 15, Nov. 9, 2009 ("You have control of the original summons, all you have to do is make a photocopy."). Whether NYPD later sends these summonses to OCA for processing and data entry is irrelevant. The NYPD was under an independent obligation to preserve copies of these documents in the context of this pending litigation. *Id.*, Tr. at 15, Nov. 9, 2009 (The Court: "In other words, if they write them, then they have the duty to preserve their own documents. They can't lay this all on OCA. . . . [I]t was in your possession. You knew about this lawsuit. It's a classic case. You had the duty to preserve it, you did not.").

## CONCLUSION

Defendants have now had countless opportunities to conform their conduct to this Court's Orders. They have failed every time. Defendants do not deserve yet another chance: they should finally be required to face real consequences for their actions. Under any circumstance, it would be disturbing that multiple orders from a federal court on an issue of

-32-

constitutional magnitude (indeed successive orders spanning decades) would be treated with such indifference.  Defendants, however, are not typical.  Defendant Kelly is the chief law enforcement officer for the City of New York and, indeed, the entire New York City Police Department.  He and the City are duty bound to enforce the law – not to violate it.  By ignoring the Court's Orders until a finding of contempt was imminent, defendants have forcefully demonstrated their contempt for this Court and the citizens the Order is meant to protect.

For the foregoing reasons, plaintiffs respectfully request that the Court find defendants in contempt, grant preliminary injunctive relief, impose the requested discovery sanctions, and order any other relief that the Court deem fair and appropriate.

Dated:      December 23, 2009                        EMERY CELLI BRINCKERHOFF
            New York, New York                            & ABADY LLP

                                            By: _____/s_____
                                                 Katherine R. Rosenfeld (8525)
                                                 Matthew D. Brinckerhoff (3552)
                                            75 Rockefeller Plaza, 20th Floor
                                            New York, New York 10019
                                            (212) 763-5000

                                            THE BRONX DEFENDERS
                                                 J. McGregor Smyth, Jr. (9995)
                                            860 Courtlandt Avenue
                                            Bronx, New York 10451
                                            (718) 838-7878

                                            EARL WARD - ATTORNEY AT LAW
                                                 Earl Ward (EW 2875)
                                            75 Rockefeller Plaza - 20th Floor
                                            New York, New York 10019
                                            (212) 763-5070

                                            *Attorneys for Plaintiffs and the Class*