**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------- X

PAUL CASALE and ANTHONY
GARCIA, on Behalf of Themselves and
Others Similarly Situated,

        Plaintiffs,

     - against -

RAYMOND W. KELLY, Commissioner
of the New York City Police Department,
et al.,

        Defendants.

-------------------------------------------------- X

MICHAEL BROWN, on Behalf of
Himself and Others Similarly Situated,

        Plaintiff,

     - against -

RAYMOND W. KELLY, Commissioner
of the New York City Police Department,
et al.,

        Defendants.

-------------------------------------------------- X

**OPINION AND ORDER**

**08 Civ. 2173 (SAS)**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4/26/10

**05 Civ. 5442 (SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.   INTRODUCTION

The City of New York, operating principally through the New York

City Police Department ("NYPD"), has continuously enforced three

unconstitutional loitering statutes for *decades* following judicial invalidation of

those laws and despite numerous court orders to the contrary.[1]  While arrests,

summonses, and prosecutions under the void statutes generally have diminished

over time, the City's description of its anti-enforcement efforts as "'reasonably

diligent and energetic'"[2] simply does not comport with reality.[3]  Over time, the

City has implemented a variety of measures to halt enforcement of the statutes.

However, the City has done little on its own initiative or with reasonable

conviction and speed to end the illegal enforcement; indeed, the City has actively

---

[1]      Though there are many defendants in these actions, including
Raymond Kelly, the Commissioner of the NYPD, and a variety of known and
unknown NYPD personnel, I generally refer to "the City" for ease of reference.

[2]      Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion
for Contempt, a Preliminary Injunction, and Discovery Sanctions ("Def. Mem.") at
7 (quoting *Powell v. Ward*, 643 F.3d 924, 931 (2d Cir. 1981)).

[3]      *Accord Brown v. Kelly* ("*Brown I*"), No. 05 Civ. 5442, 2007 WL
1573957, at *3 (S.D.N.Y. May 31, 2007) (declining to hold the City in contempt
for continued enforcement of New York Penal Law section 240.35(1) but
describing as "a gross overstatement" the City's characterization that it was
"reasonably diligent and energetic" in stopping enforcement of this statute).

dragged its feet. Year after year, the Court and plaintiffs have pushed and prodded the City into meaningful action. The City's obstinance and uncooperativeness throughout the present actions is offensive to the rule of law. The human toll, of course, has been borne by the tens of thousands of individuals who have, at once, had their constitutional rights violated and been swept into the penal system. More disturbing still, it appears that the laws — which target panhandling, remaining in a bus or train station, and "cruising" for sex — have been enforced particularly against the poor and gay men.[4]

This Court has consistently and clearly declared that enforcement of the void statutes must end no matter how difficult or tedious the task, and has repeatedly raised the specter of contempt of court. Thus far, however, I have declined to impose sanctions, trusting that the City was devoting "urgent attention"

---

[4]  *See, e.g.*, *Casale v. Kelly*, 257 F.R.D. 396, 415 n.132 (S.D.N.Y. 2009) ("Insofar as [N.Y. Penal L. §] 240.35(3) has been used to harass gay men seeking to engage in consensual sexual activity . . . it is likely that some potential plaintiffs would not choose to come forward individually to publicly challenge past prosecution. This does not lessen the gravity of their claims." (citing William N. Eskridge, Jr., *Challenging the Apartheid of the Closet: Establishing Conditions for Lesbian and Gay Intimacy, Nomos, and Citizenship, 1961-1981*, 25 Hofstra L. Rev. 817, 860-61 (1997))); *Brown v. Kelly* ("*Brown II*"), 244 F.R.D. 222, 237 (S.D.N.Y. 2007) ("[A]s a consequence of being poor and homeless, most absent plaintiffs are uninformed, disenfranchised and without the means to bring individual actions in the hope of having their convictions overturned or their extant warrants vacated.").

to these matters.[5]  I also recognized that rooting out this unlawful practice from the nation's largest police force would take a reasonable length of time.  Today, after twenty-seven, twenty-two, and nearly eighteen years since the three laws, respectively, were struck down, the City appears to have finally instituted a multi-faceted program to eliminate enforcement of the unconstitutional laws once and for all.

Nonetheless, the time for promises, excuses, and judicial forbearance is over — enough is enough.  Because the City was not reasonably diligent in reaching this point and because the City has proven itself to only act responsibly and energetically when threatened with sanctions, the City is adjudged to be in contempt of court and is subject — following a six-month grace period —  to a progressively-large fine for each future enforcement of the void laws.  Because the contempt citation and attendant monetary sanction furnish sufficient incentive for the City not to enforce the statutes, I deny plaintiffs' request for a preliminary injunction without prejudice.  Additionally, the City is subject to discovery sanctions for losing at least thirty-four hard copy summonses issued pursuant to the void laws.

---

[5]      *Brown I*, 2007 WL 1573957, at *6.

## II.   BACKGROUND

The present two actions are related in that both challenge the City's enforcement of three unconstitutional subsections of New York's loitering statute — section 240.35 of the New York Penal Law.  As described more fully below, *Brown v. Kelly* concerns subsection 1 and *Casale v. Kelly* concerns subsections 3 and 7 (collectively "the Statutes").  Though unconstitutional and unenforceable, the Statutes remain on the books because the New York Legislature has not repealed them.[6]

### A.   Judicial Invalidation of the Statutes

In 1983, in *People v. Uplinger*, the New York Court of Appeals

---

[6]     While it is unclear why the New York Legislature has not repealed these void provisions, there can be no question that formal repeal of the Statutes would in all likelihood decrease enforcement of them.  One cannot help but wonder whether the Legislature's decades-long failure to rescind these unconstitutional laws is but another example of that body's notorious dysfunction.  *See, e.g.*, Editorial, *Albany's Madhouse*, N.Y. Times, June 10, 2009, at A28 ("By the time the dysfunctional body that passes for a Legislature in New York State gets through the 2009 session, calling someone an Albany reformer will be an insult.  In a display of chutzpah that startled even old political hands, the Senate Republicans and two of the least-reputable Democrats in a deeply disreputable place brazenly declared themselves to be a reform coalition and staged a palace coup against the Democratic majority.  We're still puzzling out how these defections came about and what tawdry promises were made.  But make no mistake: Reform and bipartisanship had nothing to do with it.  Two weeks until the end of the 2009 session, lawmaking has shuddered to a maddening standstill. The passing of bills, the raising of funds, the discussion of issues have all been put far back on the back burner.").

declared section 240.35(3) unconstitutional on due process grounds.[7]  This

provision provides that a person is guilty of "loitering" — a criminal violation —

when he "loiters or remains in a public place for the purpose of engaging, or

soliciting another person to engage, in oral sexual conduct, anal sexual conduct or

other sexual behavior of a deviate nature."[8]

      In 1988, in *People v. Bright*, the New York Court of Appeals struck

down section 240.35(7) on due process grounds.[9]  This provision provides that a

person is guilty of loitering when he "loiters or remains in a transportation facility,

or is found sleeping therein, and is unable to give a satisfactory explanation for his

presence."[10]

---

[7]    *See* 460 N.Y.S.2d 514, 515 (1983) ("The object of the loitering statute is to punish conduct anticipatory to the act of consensual sodomy.  Inasmuch as the conduct ultimately contemplated by the loitering statute may not be deemed criminal, we perceive no basis upon which the State may continue to punish loitering for that purpose.").

[8]    N.Y. Penal L. § 240.35(3).

[9]    *See* 526 N.Y.S.2d 66, 68 (1988) ("We hold that this statute is unconstitutionally vague under the Due Process Clauses of the Federal and State Constitutions because it fails to give fair notice to the ordinary citizen that the prohibited conduct is illegal, it lacks minimal legislative guidelines, thereby permitting arbitrary enforcement and, finally, it requires that a citizen relinquish his constitutional right against compulsory self-incrimination in order to avoid arrest.").

[10]    N.Y. Penal L. § 240.35(7).

And in 1992, in *Loper v. New York City Police Department*, Judge

Robert W. Sweet of this Court declared section 240.35(1) unconstitutional on First

Amendment grounds, and permanently enjoined enforcement of the statute.[11]   The

Second Circuit affirmed.[12]   This provision provides that a person is guilty of

loitering when he "[l]oiters, remains or wanders about in a public place for the

purpose of begging."[13]

### B.   *Brown v. Kelly*, *Casale v. Kelly*, and the City's Efforts to Cease Enforcement of the Statutes[14]

Notwithstanding *Uplinger*, *Bright*, and *Loper*, the City, operating

through the NYPD, has unlawfully enforced the Statutes tens of thousands of

times.[15] On June 9, 2005, Eddie Wise commenced a putative class action —

---

[11]    *See* 802 F. Supp. 1029, 1047 (S.D.N.Y. 1992) ("While the Government has a valid interest in preventing fraud, preserving public order, and protecting and promoting the interests of audiences and bystanders, the interest in permitting free speech and the message begging sends about our society predominates.  Section 240.35(1) is therefore unconstitutional under the First Amendment to the United States Constitution, as applied to the states.").

[12]    *See Loper v. New York City Police Dep't*, 999 F.2d 699, 701 (2d Cir. 1993).

[13]    N.Y. Penal L. § 240.35(1).

[14]    The following summary is not exhaustive; however, it accurately captures both the significant events and the general course of these actions.

[15]    *See Casale*, 257 F.R.D. at 413 (observing that between 1983 and 2007, the City illegally enforced subsections 3 and 7 over 15,000 times); *Brown II*, 244 F.R.D. at 229 n.45 ("It is undisputed that thousands of people have been

7

subsequently recaptioned *Brown v. Kelly*[16] — seeking relief against municipal and

state defendants for unlawfully enforcing section 240.35(1).[17]  Soon thereafter, the

City entered into a stipulation aimed at preventing future enforcement of the

statute.[18]  On June 23, 2005, this Court "so ordered" that stipulation and directed

the City to cease enforcing section 240.35(1).[19]  The Court retained jurisdiction to

---

unlawfully charged with violating 240.35(1) by City law enforcement."); *Brown I*, 2007 WL 1573957, at *1 ("It is undisputed that for more than a decade after the Second Circuit's ruling [in *Loper*], enforcement of section 240.45(1) continued largely unabated.").

[16]    On November 22, 2006, Wise accepted defendants' Rule 68 Offer of Judgment, subsequent to which a judgment was entered dismissing any and all of his claims.  *See* 12/05/06 Judgment, *Brown v. Kelly*, No. 05 Civ. 5442, Docket No. 51.  Prior to the dismissal, Wise received leave to amend his Complaint to add Michael Brown as a plaintiff and class representative.  *See* 11/22/06 Stipulation and Order, *Brown v. Kelly*, Docket No. 49.

[17]    On July 24, 2007, I certified a plaintiff class consisting of all persons who have been or will be arrested, charged, or prosecuted for violation of section 240.35(1) in the State of New York after the section was declared unconstitutional. *See Brown II*, 244 F.R.D. at 237.  I also certified a damages subclass.  *See id.* at 238.  Finally, I certified a defendant class encompassing all political subdivisions and all law enforcement/prosecutorial policy-making officials in the State of New York with authority to arrest, charge, and prosecute a violation under New York Penal Law.  *See id.* at 239-43.

[18]    In January 2006, plaintiff Wise settled his claims with the State defendants, including the Office of Court Administration ("OCA").  Pursuant to that settlement, OCA was subpoenaed to produce information contained in its electronic data system, which tracks and stores summonses issued pursuant to section 240.35(1).

[19]    *See* Stipulation and Order, *Brown v. Kelly*, Docket No. 5 ("June 23, 2005 Order") ¶ 1.

ensure compliance with the terms of the June 23, 2005 Order.[20]

In June and July 2005, the City took various steps to stop enforcement of section 240.35(1).  These steps included sending notices to all NYPD precincts and commands and respective employees that section 240.35(1) is void and unenforceable; reading FINEST messages at police officer roll calls;[21] sending notices to the Offices of the District Attorneys; and immediately seeking to vacate all outstanding warrants relating to charges or summonses under section 240.35(1).[22]

The City, as I have previously explained, "seem[s] to have done little thereafter."[23]  More specifically:

> Defendants failed to take the reins on monitoring their own compliance with the June 23, 2005 Order.  It is for this reason that defendants are able to assert in their defense that it was not until November 2006, when plaintiff confronted them with hard data, that defendants knew of the frequency with which section 240.35(1) continued to be enforced — *i.e.*, that hundreds of summonses and over eighty warrants had been issued since the June 23, 2005 Order.  The burden of tracking the continued unlawful

---

[20]     *See id.* ¶ 9.

[21]     A FINEST message is a written department-wide communication that, per standard operating procedures, is required to be read at ten consecutive roll calls. *See Brown I*, 2007 WL 1573957, at *3 n.17.

[22]     *See* June 23, 2005 Order ¶¶ 2-8.

[23]     *Brown I*, 2007 WL 1573957, at *2.

enforcement of section 240.35(1) has always been carried by plaintiff. It has also been defendants' *modus operandi* to cast suspicion on plaintiff's data demonstrating the pervasiveness of the continuing enforcement.

As a result of defendants' continuing failure to comply with court orders, by letter to the Court dated November 9, 2006, plaintiff requested leave to file a contempt motion against defendants. At a pre-motion conference held on November 29, 2006, defendants promised to undertake a plan of action that would curb the continued enforcement of section 240.35(1). This plan included sending targeted notices to those NYPD officers who had issued unlawful summonses. Defendants also proposed additional training for police officers to be held between November 2006 and March 2007, and for sergeant and lieutenant promotional classes to remind all officers that the statute is unenforceable. Additionally, defendants promised to take steps necessary to vacate all warrants issued as a result of section 240.35(1) summonses. In reliance upon defendants' assurances that plaintiff was going to get the necessary relief, the Court denied plaintiff's request to move for a judgment of contempt.[24]

On December 14, 2006, the Court ordered the City to take a number of additional remedial actions — ones the City had promised to take — in order to halt continued enforcement of section 240.35(1), including increased training and letter notification to officers who had illegally enforced the statute.[25]

Though the June 23, 2005 Order was crystal clear that enforcement of the statute must cease, "defendants continued to arrest, prosecute, issue bench

---

[24]   *Id.* at *2-*3 (footnotes omitted).

[25]   *See* Order, *Brown v. Kelly*, Docket No. 54.

warrants, and issue an alarming number of summonses for violations of section 240.35(1)."[26]  During the nineteen months *following* the June 23, 2005 Order, from July 2005 to January 2007, NYPD officers issued 772 summonses under the statute.[27]  By comparison, during the nineteen months *preceding* the June 23, 2005 Order, from January 2002 to May 2005, NYPD officers issued 821 summonses.[28]

On February 26, 2007, plaintiff Brown informed the Court that notwithstanding defendants' promises and in the face of the December 14, 2006 Order, an additional twenty-three unlawful bench warrants and ninety-six unlawful summonses had been issued to New Yorkers between November 1, 2006 and February 21, 2007.  In light of this new information, the Court granted plaintiff leave to move for civil contempt.

From January 2, 2007 through March 14, 2007, NYPD officers issued summonses under section 240.35(1) at an average rate of approximately one every other day.[29]  On March 13, 2007, the City's counsel contacted the OCA and requested that the court system take action "on cases charging unconstitutional

---

[26]   *Brown I*, 2007 WL 1573957, at *1.

[27]   *See id.*

[28]   *See id.*

[29]   *See id.* at *1 n.1.

subsections of Penal Law § 240.35."[30]  The OCA agreed to take a number of steps

including vacating bench warrants and dismissing cases.[31]

       On March 30, 2007, plaintiff Brown moved for a judgment of civil

contempt against the City and for the imposition of coercive sanctions for each

prospective incident of enforcement.  On May 31, 2007, in *Brown I*, this Court

denied the motion, concluding that civil sanctions were not warranted because the

City appeared to have "turned [its] behavior around" in December 2006, taking

"responsibility for [its] noncompliance with the June 23, 2005 Order and

be[coming] proactive in seeking to end the unlawful enforcement of the statute."[32]

Yet I emphasized:

> Although plaintiff's motion is denied, I note that the issues
> it raised were not clear-cut.  The steady rate of unlawful
> enforcement of section 240.35(1) that has persisted for
> almost thirteen years after *Loper* is simply unacceptable.
> Defendants' long-standing apathy towards this problem
> was offensive.  Nevertheless, the Court is convinced that
> defendants have made avoiding contempt a top priority and
> are now striving to fully comply with the June 23, 2005
> Order.  Certainly, this includes treating the issuance of a

---

[30]    3/23/07 Letter from Juanita Bing Newton, Deputy Chief
Administrative Law Judge for Justice Initiatives, Criminal Court of the City of
New York, to Rachel Seligman, Defendants' Counsel, Ex. 1 to Declaration of
Katherine Rosenfeld, Plaintiffs' Counsel, in Support of Plaintiffs' Motion for
Contempt, a Preliminary Injunction, and Discovery Sanctions ("Rosenfeld Decl.").

[31]    *See id.*

[32]    2007 WL 1573957, at *4.

single summons under section 240.35(1) as a serious problem deserving urgent attention. To this end, the Court is prepared to revisit the issue of defendants' diligence every two months, until every outstanding bench warrant has been vacated and no more summonses for violations of an unconstitutional statute are issued.[33]

On June 19, 2007, the NYPD circulated a memorandum to commanding officers instructing them that "Penal Law 240.35, subdivisions 1, 3, and 7 have been declared unconstitutional" and that "arrests made and summonses issued for these offenses are unenforceable."[34] In addition, the First Platoon Desk Officer was directed to review all summonses for section 240.35 to ensure compliance with department voidance procedures.[35] A similar memorandum was circulated among Housing Bureau Commanders on June 27, 2007.[36]

Also in June 2007, the Chief of Patrol's office began to investigate summonses issued under the Statutes, which entailed interviewing the offending

---

[33]    *Id.* at *6 (footnote omitted).

[34]    6/19/07 Memo #36-07 from Chief of Patrol Nicholas Estavillo to Commanding Officers, Ex. 2 to Rosenfeld Decl.

[35]    *See id.*

[36]    *See* 6/27/07 Memo #474s.07 from Joanne Jaffe, Chief of Housing, to Housing Borough Commanders, Ex. H to Declaration of Rosemary DeBellis, Office of the Deputy Commissioner for the NYPD, in Support of Defendants' Opposition to Plaintiffs' Motion for Contempt, Injunctive Relief, and Discovery Sanctions ("DeBellis Decl.").

officer and instructing him or her not to issue summonses under the Statutes.[37]
"[T]he officer could be issued a Schedule A Command Discipline, at the discretion of the Commanding Officer."[38]

In March 2008, plaintiffs filed *Casale v. Kelly*, a putative class action contending that the City of New York, operating through the NYPD, willfully continued to enforce subsections 3 and 7 of New York Penal Law section 240.35.[39] Following the filing of *Casale*, on April 21, 2008, the City sent a FINEST message to all NYPD officers instructing them not to enforce the Statutes.[40] This message also contained a directive that all copies of the Penal Law maintained by commands, including those maintained in the command library, must have the Statutes stricken by drawing a line through them in black ink.[41]

On May 1, 2008, the Court "so ordered" a stipulation requiring the

---

[37]     *See* DeBellis Decl. ¶¶ 20-21.

[38]     *Id.* ¶ 21.

[39]     On June 1, 2009, I certified two plaintiff classes in *Casale* — one consisting of all persons who have been or will be arrested, charged, or prosecuted for violation of subsections 3 or 7 in New York City after those statutes were declared unconstitutional; and a second class consisting of all persons who have been arrested, charged, or prosecuted for a violation of subsections 3 or 7 in New York City within the applicable statute of limitations. *See Casale*, 257 F.R.D. at 415. I also certified a number of subclasses to address potential defenses. *See id.*

[40]     *See* Ex. I to DeBellis Decl.

[41]     *See id.*

City to take action to stop future NYPD enforcement of subsections 3 and 7,

including contacting the criminal court system and the District Attorneys for the

five boroughs.[42]  The May 1, 2008 Order also directed the City to "abide by and

reinforce" its "policy [against] enforcement of [sections 240.35(3) and (7)]."[43]  The

City also agreed to provide plaintiffs with monthly reports on all the summonses

issued under the subsections 3 and 7.[44]

　　　In July 2008, a lesson plan for Command Level Training was issued

that reiterated that the Statutes are unconstitutional and should not be enforced.[45]

In January 2009, during a training on panhandling, officers were reminded that

subsection 1 is unenforceable.[46]

　　　In May 2009, plaintiffs informed the Court at a conference that the

NYPD's enforcement of the statutes was "trending up."[47]  Consequently, the Court

---

[42]　　*See* 5/1/08 Stipulation and Order, *Casale v. Kelly*, No. 08 Civ. 2173, Docket No. 9 ("5/1/08 Order") ¶¶ 3-4.  On May 9, 2008, the City's counsel sent letters to the District Attorneys and the criminal court system.  *See* Exs. B & C to Declaration of Rachel Seligman Weiss, Defendants' Counsel, in Opposition to Plaintiffs' Motion for Contempt, Injunctive Relief, and Discovery Sanctions ("Seligman Weiss Decl.").

[43]　　5/1/08 Order ¶ 1.

[44]　　*See id.* ¶ 5.

[45]　　*See* Ex. J to DeBellis Decl.

[46]　　*See* DeBellis Decl. ¶ 13 & Ex. K.

[47]　　5/6/09 Transcript of Conference at 4.

questioned whether plaintiffs wished to pursue contempt proceedings.  However,

plaintiffs "did not bring a motion for contempt at that time . . . because defendants

had presented a proposed remedial plan to plaintiffs (on the same day as the court

conference) that provided for training and discipline for issuing officers."[48]

In June 2009, the City distributed a memo to training sergeants

reiterating the unconstitutionality of the Statutes and advising that continued

enforcement would result in disciplinary action.[49]  On June 3, 2009 and September

3, 2009, the City sent FINEST messages regarding the unenforceability of

subsections 1, 3, and 7.[50]  The June 3 message also reiterated the April 21, 2008

directive to strike the Statutes from all copies of the Penal Law maintained by

commands, including those maintained in the command library.[51]

In October 2009, the NYPD conducted a review of precinct libraries

to determine if the three subsections had been stricken from all copies of the penal

law.  "According to the NYPD's report on this process, the commands with copies

---

[48]     Rosenfeld Decl. ¶ 12.

[49]     *See* Ex. L to DeBellis Decl.

[50]     *See* Exs. M & N to DeBellis Decl.  Additionally, in September and
November 2009, the City circulated to patrol, housing, and transit commands
memoranda similar to the memoranda issued in June 2007. *See* Exs. O, P, & Q to
DeBellis Decl.

[51]     *See* Ex. M to DeBellis Decl.

still containing the Statutes as of October 2009 were: 90th, 94th, BNTF, 60th, TD

#34, 41st, BXTF, 26th, 1st, 5th, 6th, 7th, 9th, 10th, 13th, Midtown South, 17th,

26th, 104th, 109th, 110th, 100th, 101st, 103rd, 106th, 107th, 113th, Hwy 3, QSTF,

TD #20."[52]

     Also in October 2009, the Police Commissioner instructed the

NYPD's Internal Affairs Bureau ("IAB") to take over investigation into

summonses issued for the Statutes.[53]  When IAB determines that an

unconstitutional summons has been issued, the issuing officer is interviewed and

"IAB sends a memo to the issuing officer's Commanding Officer instructing the

Commanding Officer to issue the officer a Schedule B Command Discipline, with

a minimum of the [sic] loss of one day's vacation time."[54]

     In October 2009, plaintiffs conducted expedited depositions of NYPD

officers who had recently issued summonses under the Statutes.  These depositions

revealed the widespread use of "cheat sheets" or "Master C Summons Lists",

which are unofficial lists of summonsable offenses carried by many NYPD officers

inside their official NYPD summons books — often written and distributed

---

[52]    Rosenfeld Decl. ¶ 23 (citing Bates No. NYC0002239).

[53]    *See* DeBellis Decl. ¶ 27.  According to the City, "[t]he function of IAB is to investigate allegations of corruption and misconduct committed by members of the service."  *Id.* ¶ 28.

[54]    *Id.* ¶ 30.

informally amongst police officers — that the officers use in the field to determine what charges to issue in a summons.[55] The depositions further revealed that many of these sheets contained the unconstitutional loitering subsections at issue in this case.[56]

Following plaintiffs' uncovering of the cheat sheets, plaintiffs demanded the City take a number of actions to remove the unconstitutional laws from those documents. Though the City agreed to undertake various measures to review and correct the cheat sheets, the City rejected plaintiffs' demand for production of the cheat sheets. Plaintiffs applied to the Court for a preservation order on December 1, 2009.[57] The City opposed the application, arguing that the cheat sheets were not relevant or discoverable. On December 9, 2009, the Court rejected the City's position, and ordered the City to preserve the cheat sheets, to

---

[55]    *See, e.g.*, 10/01/09 Deposition of Dorian Dowe ("Dowe Dep.") at 41-42, 72 (estimating that approximately fifty to sixty percent of officers in a command use cheat sheets), Ex. 4 to Rosenfeld Decl.; 10/01/09 Deposition of Charles Burke ("Burke Dep.") at 58-59 (describing use of cheat sheets as "standard practice"), Ex. 5 to Rosenfeld Decl.; 10/15/09 Deposition of Michael Nazario ("Nazario Dep.") at 130, Ex. 6 to Rosenfeld Decl; *see also* Ex. 8 to Rosenfeld Decl. (examples of cheat sheets).

[56]    *See, e.g.*, Dowe Dep. at 39; Burke Dep. at 50-51; Nazario Dep. at 43, 101-02; 10/15/09 Deposition of Ronald Pereira ("Pereira Dep.") at 33-34, Ex. 7 to Rosenfeld Decl.; Investigating Officer's Report, Ex. 15 to Rosenfeld Decl.

[57]    *See* 12/1/09 Letter from Katherine Rosenfeld, Plaintiffs' Counsel, to the Court, Ex. 13 to Rosenfeld Decl.

produce to plaintiffs any page that contained the void laws, to disseminate notice of

a review process to all NYPD officers, and to complete this review by a date

certain.[58]  The City completed this review process in January 2010, finding nearly

1,400 cheat sheets containing the void laws.[59]

         According to the City, additional efforts are underway to affix a

sticker warning officers not to issue summonses under the laws to each new book

of summonses signed out by officers, and to require certain officers, including

supervisors, to a carry a new memo book insert of Common Summonsable

Offenses that does not reference the laws and specifically warns not to enforce the

---

[58]      *See* 12/9/09 Transcript at 26-30.

[59]      On February 12, 2010, the City produced 1,361 cheat sheets to
plaintiffs.  According to plaintiffs' preliminary review of the sheets, out of the
approximately 350 officers who issued summonses for the Statutes after June 1,
2007, at least 18, and as many as 85, carried cheat sheets containing the void
Statutes.  *See* Plaintiffs' Reply Memorandum of Law in Further Support of Motion
for Contempt, a Preliminary Injunction, and Discovery Sanctions at 5.  Plaintiffs
state that the officer's name was not legible on 141 cheat sheets, and request that
the Court order the City to log the cheat sheet review into the COGNOS database
and provide plaintiffs with the data.  *See id.*  According to the plaintiffs, such data
entry would permit the parties to determine if all 85 officers issued void
summonses because they relied upon inaccurate cheat sheets and to determine the
identity of the 141 officers whose names were illegible.  *See id.*  The City is so
ordered.  Additionally, the City is ordered to state — as as additional data fields
(attached to the relevant member of service) in the monthly reports of recent
enforcement data provided to plaintiffs — whether the issuing officer used a cheat
sheet that included any of the Statutes.

laws.[60]  According to the City, "[t]hese measures are aimed to communicate the message to the officer at the time when he or she is close in time to issuing summonses."[61]

### C.   The City's Recent Enforcement of the Statutes[62]

The City reports that 462 unlawful summonses were issued pursuant to sections 240.35(1), (3), and (7) from June 2007 — that is, following *Brown I* — through February 2010.[63]  Plaintiffs report 480 such summonses.[64]  Excluding from

---

[60]   *See* Def. Mem. at 3.

[61]   *Id.*

[62]   Though this section focuses on summonses, enforcement of the Statues has historically taken a variety of additional forms, including arrests, prosecutions, warrants, and fines.  *See, e.g.*, *Casale*, 254 F.R.D. at 401-02 (detailing various manners of enforcement of sections 240.35(3) and (7)); *Brown I*, 2007 WL 1573957, at *1-*2 (same as to section 240.35(1)).  Furthermore, summons data do not reflect *attempts* to charge the void laws, such as where "citizens [are] unlawfully arrested on the street, taken to the station house, and released without ever being charged."  *Brown I*, 2007 WL 1573957, at *2.

[63]   *See* 4/26/10 Letter from Linda Donahue, Defendants' Counsel, to the Court ("Donahue Letter") at 2.

[64]   *See* Supplemental Declaration of J. McGregor Smyth, Jr. in Support of Plaintiffs' Motion for Contempt, a Preliminary Injunction, and Sanctions ("Smyth Supp. Decl.") ¶ 3.  The parties disagree about whether to count a number of specific summonses.  Though I need not decide any such dispute at this time, I observe that the integrity of the NYPD's data — and, more generally, the City's ability to accurately track its enforcement of the Statutes — is questionable.  Plaintiffs raise three major concerns:  (1) consistent failure to list the relevant subsection on the charging instrument; (2) consistent failure to enter the correct subsection into the NYPD database; and (3) failure to enter the summons

these totals enforcement of subsections 3 and 7 before May 2008 (when the City

was first ordered by this Court to cease enforcement of those subsections), the City

reports 241 and plaintiffs report 256 unlawful summonses.[65]

For subsection 1, from June 2007 through February 2010, the City

reports 110 and plaintiffs report 123 unlawful summonses.[66]  For the recent six-

month period from September 2009 through February 2010, the City reports four

and plaintiffs report sixteen unlawful summonses under this provision.[67]

For subsection 3, from May 2008 through February 2010, the City and

plaintiffs both report 125 unlawful summonses.[68]  For the period September 2009

----

prosecution into the NYPD database entirely.  *See* Reply Declaration of J.
McGregor Smyth, Jr. in Support of Plaintiffs' Motion for Contempt, a Preliminary
Injunction, and Sanctions ¶ 13.  Plaintiffs' concerns are serious and genuine.  The
City admits that there are data entry problems.  *See, e.g.*, DeBellis Decl. ¶ 6
(claiming 21 data entry errors and reducing the City's total accordingly).  Even
more troubling, the City admits a large number of unlawful summonses do not
even appear in the database.  *See* Donahue Letter at 1 ("Defendants apologize to
the Court for their previous oversight in not including in their calculations
summonses produced by OCA which did not appear in the NYPD database . . . .").
Additionally, the City states that its calculations do not include any of 20
summonses for loitering, because OCA was unable to determine if those
summonses were issued under one of the void subsections (as opposed to a lawful
subsection) of the loitering statute.  *See id.*

[65]    *See* Donahue Letter at 4; Smyth Supp. Decl. ¶ 5.

[66]    *See* Donahue Letter at 4; Smyth Supp. Decl. ¶ 6.

[67]    *See id.*

[68]    *See* Donahue Letter at 5; Smyth Supp. Decl. ¶ 7.

through February 2010, the City reports ten and plaintiffs report twelve unlawful summonses under this provision.[69]

For subsection 7, from May 2008 through February 2010, the City reports 6 and plaintiffs report 8 unlawful summonses.[70]  For the period September 2009 through February 2010, the City and plaintiffs both report three unlawful summonses under this provision.[71]

The parties agree that, most recently, an NYPD officer enforced subsection 3 on February 2, 2010, and that another officer twice enforced subsection 7 on February 27, 2010.[72]  Additionally, the City's Parks Department issued two summonses for violations of subsection 3 on April 6, 2010.[73]

In summary, though the parties dispute the precise extent of recent enforcement of the Statutes, it is undisputed that hundreds of summonses have

---

[69]     *See id.*

[70]     *See* Donahue Letter at 6; Smyth Supp. Decl. ¶ 8.

[71]     *See id.*

[72]     *See* Supplemental Declaration of Katherine Rosenfeld in Further Support of Plaintiffs' Motion for Contempt, a Preliminary Injunction, and Discovery Sanctions ("Rosenfeld Supp. Decl.") ¶¶ 3-4; Supplemental Declaration of Rosemary DeBellis in Support of Defendants' Opposition to Plaintiffs' Motion for Contempt, Injunctive Relief, and Discovery Sanctions ("DeBellis Supp. Decl.") ¶ 2.

[73]     *See* DeBellis Supp. Decl. ¶ 2.

issued in violation of this Court's Orders.  It is likewise clear that summonses

continue to issue under the void laws, albeit at a much lower rate than in years past.

## III.   DISCUSSION

Plaintiffs now move for civil contempt, a preliminary injunction, and

discovery sanctions.

### A.   Contempt

#### 1.   Applicable Law

"[I]t is firmly established that the power to punish for contempts is

inherent in all courts."[74]  "Civil as distinguished from criminal contempt is a

sanction to enforce compliance with an order of the court or to compensate for

losses or damage sustained by reason of noncompliance."[75] A court may hold a

party in civil contempt for failure to comply with a court order if "'(1) the order the

contemnor failed to comply with is clear and unambiguous, (2) the proof of

noncompliance is clear and convincing, and (3) the contemnor has not diligently

attempted to comply in a reasonable manner.'"[76]  While "[t]he failure to meet the

---

[74]      *Chambers v. Nasco, Inc.*, 501 U.S. 32, 44 (1991) (quotation marks and alteration omitted).

[75]      *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949).

[76]      *Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 655 (2d Cir. 2004) (quoting *King v. Allied Vision, Ltd.*, 65 F.3d 1051, 1058 (2d Cir. 1995)). *Accord Powell*, 643 F.2d at 931 (requiring, as to the third prong, that the contemnor failed to be "reasonably diligent and

strict requirements of an order does not necessarily subject a party to a holding of
contempt,"[77] civil contempt "includes failures in meaningful respects to achieve
substantial and diligent compliance."[78] "Reasonable diligence, at the very least,
requires a party to develop and execute reasonable methods of compliance."[79] "It
need not be established that the violation was willful."[80]

### 2.    Analysis

The City does not dispute that plaintiffs satisfy the first requirement

for civil contempt, in that the Court's June 23, 2005 Order and May 2, 2008 Order

(the "Orders") clearly and unambiguously direct the City to cease enforcing

sections 240.35(1), (3), and (7).[81]   Nor does the City contest that its own tracking

data (among other evidence) constitute clear and convincing proof of

_____

energetic in attempting to accomplish what was ordered").

[77]      *Dunn v. New York State Dep't of Labor*, 47 F.3d 485, 490 (2d Cir.
1995).

[78]      *Aspira v. Board of Educ.*, 423 F. Supp. 647, 649 (S.D.N.Y. 1976).

[79]      *Zino Davidoff SA v. CVS Corp.*, No. 06 Civ. 15332, 2008 WL
1775410, at *8 (S.D.N.Y. Apr. 17, 2008).

[80]      *Paramedics*, 369 F.3d at 655 (citing *Donovan v. Sovereign Sec. Ltd.*,
726 F.2d 55, 59 (2d Cir. 1984)).

[81]      *See NBA v. Design Mgmt. Consultants, Inc.*, 289 F. Supp. 2d 373, 377
(S.D.N.Y. 2003) ("[An order is] clear and unambiguous where it is specific and
definite enough to apprise those within its scope of the conduct that is being
proscribed or required.").

noncompliance.[82]  Thus, as was the case when the Court last opined on the issue of

contempt,[83] the City's single defense against contempt is that it has made

"reasonably diligent and energetic efforts to comply with all court orders . . . ."[84]

The City's characterization of its efforts as reasonably diligent is an

overstatement.[85]

      In the decades since the laws were invalidated, the City has

implemented a number of anti-enforcement measures, including:  trainings of

---

[82]     *See Levin v. Tiber Holding Co.*, 277 F.3d 243, 250 (2d Cir. 2002) ("In the context of civil contempt, the clear and convincing standard requires a quantum of proof adequate to demonstrate a reasonable certainty that a violation occurred. (quotation marks omitted)).

[83]     *See Brown I*, 2007 WL 1573957, at *3 ("Defendants' sole defense to contempt is that they are now, and have always been, 'reasonably diligent and energetic' in complying with the June 23, 2005 Order.").

[84]     Def. Mem. at 6.

[85]     *Accord Brown I*, 2007 WL 1573957, at *3 ("[Defendants' characterization that they were reasonably diligent and energetic] is a gross overstatement.  There is no question that for a long period of time, from approximately July 2005 to December 2006, Defendants *were* in contempt of this Court's June 23, 2005 Order.  Although defendants went through the motions of carrying out the specific remedial measures set forth in that Order, the numbers of arrests, bench warrants and prosecutions predicated on section 240.35(1) declined only slightly; the decline in summonses was demonstrably negligible.  While, as a practical matter, one would expect a *de minimis* number of enforcement actions to persist, the 772 unconstitutional summonses for violations of section 240.35(1) issued by the NYPD in the nineteen-month period after the Order — only six percent fewer than the number of summonses issued during the nineteen-month period before the Order — tell 'a sorry tale of noncompliance.'").

25

recruits and officers; FINEST messages reinforcing NYPD policy not to enforce the laws; use of a computer database to identify summonses issued under the laws; investigation of summonses issued under the laws, now conducted by the IAB; discipline of officers who issue summonses, now requiring a mandatory "B" Command Discipline with a minimum loss of one day's vacation time; striking out of all references to the laws in any NYPD copies of the New York Penal Law; deletion of references to the laws in any non-NYPD reference materials carried by officers; distribution to officers in their paychecks of an official written order not to enforce the laws; and reinforcement of the Patrol Guide requirement that a supervisor review all summonses and flag any written under the laws.  The NYPD is also writing to recipients of summonses issued under the laws informing them that the summons was issued improperly.

This catalog of the actions taken by the City masks and obscures the City's generally lethargic approach to compliance with the Orders.  Nearly every measure that the City has undertaken has been at the direction of the Court, the prodding of plaintiffs, and/or under the threat of sanctions.  For example, it was only under court order that the City implemented a letter notification program.[86] And it was only under the Court's explicit direction that the City distributed

---

[86]     *See* Rosenfeld Decl. ¶ 3.

26

paycheck warnings.[87]  It was only after a May 2009 conference, wherein the Court

raised the specter of contempt proceedings, that Commissioner Kelly advocated

repeal of the Statutes.[88]

In fact, prior to this most recent threat of contempt, and since *Brown I*,

the City did relatively little proactively or with reasonable dedication to curb its

consistent enforcement of the Statutes.  On September 14, 2009, plaintiffs wrote to

the Court as follows:

> [T]he City of New York continues to enforce the
> unconstitutional loitering laws at issue here . . . .  Plaintiffs
> intend to conduct immediate Rule 30(b)(6) and other
> depositions in order to craft remedial solution to this
> enforcement crisis, and to pursue possible remedies for a
> finding of contempt against the City of New York . . . .
> [W]hatever "plan" the City claims to have adopted in the
> wake of these lawsuits is clearly not working.  More than
> 150 summonses have issued since this Court's contempt
> ruling in *Brown* in May 2007 . . . .  These depositions will
> allow us to recommend concrete steps the City can take to
> actually stop charging innocent people under void laws.[89]

Immediately thereafter, the City suddenly enacted new initiatives.

Two weeks later, Police Commissioner Kelly first assigned the NYPD's IAB to

---

[87]    *See Brown I*, 2007 WL 1573957, at *5.

[88]    *See* Exs. U & V to DeBellis Decl.

[89]    Ex. I to Reply Declaration of Katherine Rosenfeld ("Rosenfeld Reply
Decl.").

27

investigate summonses for violation of the Statutes.[90]  The NYPD also began

imposing a B Command Discipline, "which stays in the officer's personnel file

permanently and requires a minimum loss of one vacation day."[91]  According to the

City, "[s]ince IAB typically investigates serious misconduct, the message sent by

its investigation and the enhanced penalty is likely to affect not only the subject

officer but sends a message throughout the entire department about the seriousness

of the conduct."[92]  The City therefore concedes that, until October 2009, IAB's

non-involvement communicated to its officers that enforcement of the Statutes was

not serious misconduct.

        Prior to October 2009, the NYPD's investigatory and disciplinary

process appears to have been both discretionary and toothless: "the officer *could* be

issued a Schedule A Command Discipline," and "the Commanding Officer *might*

also order the command's Training Sergeant to re-instruct."[93]  Detective Nicholas

Rizzuti, who was assigned on October 2, 2009 to run the IAB investigations, could

---

[90]     *See* DeBellis Decl. ¶ 27.

[91]     Def. Mem. at 10.

[92]     *Id.* at 11.

[93]     DeBellis Decl.  ¶ 27.

state little about the previous program.[94]  Although he conceded that it would be

important (as the person responsible for the current investigation), he did not know

who was previously in charge of investigations, he inherited no policies or

procedures, and he did not know how many officers were disciplined.[95]  Even the

sufficiency of the IAB's current program is unclear.  As far as the Court is aware,

no written policies or procedures govern its operation or dictate that officers who

issue summonses for the Statutes will receive B Command Disciplines, or state that

supervisors who fail to train officers will be disciplined.[96]  The new system appears

to be ad hoc.

        The City also points to its December 2009/January 2010 review of

officers' cheat sheets as an example of its diligence.  Quite the opposite is true.

Plaintiffs, not the City, discovered the widespread use of cheat sheets during

depositions in October 2009, and demanded a department-wide review.  While the

City agreed that action needed to be taken with respect to the cheat sheets — the

threat of contempt looming at this time — the City's abject failure to previously

identify the widespread use of cheat sheets containing the void Statutes is

_____

[94]     See Deposition of Nicholas Rizzuti at 16, Ex. J to Rosenfeld Reply
Decl. ("I was aware that there was an investigation prior, but I honestly didn't
know what it entailed.").

[95]     See id. at 17, 26-28.

[96]     See id. at 16, 60-61, 64, 87.

29

incomprehensible.  That the City has not been monitoring and correcting these sheets demonstrates the City's lax approach to ending enforcement of the Statutes. That the cheat sheets are not official NYPD documents is no excuse, for not only have they been in use for years, but supervising officers were well aware of their usage.[97]

The City points to other actions to demonstrate reasonable diligence, such as striking out all references to the Statutes in any NYPD copies of the New York Penal Law.  But, once again, in context, the City's weak effort to end the illegal enforcement is exposed.  Via FINEST messages dated April 21, 2008 and June 3, 2009, the NYPD ordered that all copies of the Penal Law maintained in all NYPD commands were to be redacted to omit the Statutes.  However, the City never confirmed whether its directive had been executed.  Not until October 19, 2009 did the City conduct a systematic survey of all NYPD precinct libraries in order to ensure that the Statutes were deleted from their copies of the New York Penal Law.  This review revealed that dozens of commands still contained copies of the Penal Law with the offending Statutes, in violation of the order in the two FINEST messages.  Evidence in the record reveals that officers consult these

---

[97]     *See, e.g.*, Pereira Dep. at 128 ("[Supervisor] was aware that I had that sheet on me" when issuing a summons for section 240.45(3)).

books,[98] thereby establishing the importance of redacting the void Statutes from them. Failure to confirm that the Statutes had been deleted from the NYPD's copies of the New York Penal Law demonstrates the City's lack of diligence.

The City narrowly escaped sanctions in 2007, and it was the Court's genuine hope at that time that such a close call would motivate the City to meaningfully persevere to end the illegal enforcement — that is, to act with urgency to uncover and root out the reasons *why* enforcement had not yet ceased. This the City failed to do. In the years since the City was ordered to stop enforcing the Statutes, the City appears to have made little effort to understand and address the mechanisms underlying continued enforcement of the Statutes. Only when threatened with sanctions in September 2009 did the City begin to act with reasonable energy and diligence toward the desired goal. But where such a last minute frenzy was key to the avoidance of contempt in 2007, this time, it's too little, too late.[99] However effective the newest measures are, the City's spurt of activity on the heels of the beginning of the latest contempt proceedings cannot

---

[98]     *See* Burke Dep. at 71.

[99]     *See, e.g.*, *Benjamin v. Fraser*, No. 75 Civ. 3073, 2002 WL 31845111, at *7 (S.D.N.Y. Dec. 16, 2002) ("[S]uch 'eleventh-hour' attempts at compliance with my order fail to rescue defendants from contempt."); *Benjamin v. Sielaff*, 752 F. Supp. 140, 147 (S.D.N.Y. 1990) (holding defendants in contempt for failing to cure violations even though defendants had achieved compliance since the filing of the contempt motion).

save the City from the consequences of its previous indifference.  The long history

of the City's apathetic behavior cannot be ignored, nor can the Court overlook the

fact that only the prospect of sanctions energizes the City to act responsibly and

diligently against enforcement of the Statutes.[100]  For all of these reasons, the City

is adjudged to be in contempt of court.

### 3.    Remedy

A sanction imposed on a party held in civil contempt may serve either

or both of two purposes: to coerce the contemnor to comply in the future with the

court's order, or to compensate the complainant for losses resulting from the

contemnor's past non-compliance.[101]  Sanctions for "indirect" civil contempt —

contempt resulting from actions occurring outside the courtroom — are designed to

compel future compliance with a court order and are avoidable through

compliance.[102]  In assessing sanctions for civil contempt, the district court "is

---

[100]    I have not recounted each aspect of the City's conduct that warrants
the contempt citation issued herein; rather, I have only provided several illustrative
examples.

[101]    *See Weitzman v. Stein*, 98 F.3d 717, 719 (2d Cir. 1996); *New York
State Nat'l Org. for Women v. Terry* ("*NOW 1989*"), 886 F.2d 1339, 1351-53 (2d
Cir. 1989).

[102]    *See International Union, United Mine Workers of Am. v. Bagwell*, 512
U.S. 821, 828 (1984) (explaining that the contemnor must have the opportunity to
"reduce or avoid the fine through compliance").

vested with wide discretion in fashioning a remedy[,]"[103] though "a court is obliged to use the least possible power adequate to the end proposed."[104]

A court may impose a fine as a sanction only if "the contemnor is able to purge the contempt . . . by committing an affirmative act, and thus carries the keys of his prison in his own pocket."[105]  "The district court is counseled to consider several factors in calculating a fine, including 'the character and magnitude of the harm threatened by continued contumacy,' the 'probable effectiveness of any suggested sanction in bringing about [compliance],' and the contemnor's ability to pay."[106] "The ultimate consideration is whether the coercive sanction — here, a fine — is reasonable in relation to the facts."[107]  "[A] financial penalty may be the most effective means of insuring compliance" if a city refuses to adhere to a court order.[108]

---

[103]     *Weitzman*, 98 F.3d at 719 (quotation marks omitted).

[104]     *Spallone v. United States*, 493 U.S. 265, 276 (1990) (quotation marks omitted).

[105]     *ACLI Gov't Securities, Inc. v. Rhoades*, No. 81 Civ. 2555, 1995 WL 731627, at *3 (S.D.N.Y. Dec. 11, 1995) (quotation marks omitted).

[106]     *Paramedics*, 369 F.3d at 657-58 (quoting *Perfect Fit Indus. v. Acme Quilting Co.*, 673 F.2d 53, 57 (2d Cir. 1982) (alteration in original).

[107]     *NOW 1989*, 886 F.2d at 1353.

[108]     *United States v. Yonkers*, 856 F.2d 444, 458 (2d Cir. 1998), *rev'd on other grounds*, *Spallone*, 493 U.S. 265. at 276-80.

Here, as sanctions for the City's civil contempt, plaintiffs request a

coercive sanction of $5,000 for each prospective violation of the Court's Orders.

The City argues that prospective coercive sanctions are unnecessary because the

most recent statistics show reduced enforcement.[109]  This misses the point.  Over

the long history of these lawsuits, the City has, if anything, shown itself to lack the

resolve to end the illegal enforcement on its own.  Like clockwork, the City's anti-

enforcement actions correlate directly to its apparent concern that the Court may

find it in contempt.  This pattern makes clear that prospective sanctions will

accomplish the desired result of eliminating the City's enforcement of the

Statutes.[110]  Indeed, to keep enforcement numbers down, the various steps

implemented must continue, systematically and with vigor.  And if these measures

---

[109]      The City also argues that prospective coercive sanctions are
inappropriate against a municipality.  The Supreme Court and the Second Circuit
have held otherwise.  *See Spallone*, 493 U.S. at 276 (concluding that it was
appropriate for the district court to hold in contempt and fine the City of Yonkers);
*Yonkers*, 856 F.2d at 460 ("Obviously, the City [of Yonkers] believes that there is a
price it is willing to pay to avoid compliance with the order of the District Court.
The District Court was entitled to establish a schedule of fines that would secure
compliance with its orders . . . .").

[110]      In *Brown I*, this Court observed that sanctions would not stave off the
issuance of summonses by patrolling officers.  *See* 2007 WL 1573957, at *5 ("The
problem is that some individual officers on patrol have yet to grasp the idea.  It is
unlikely that imposing a pecuniary sanction on defendants would sufficiently
prevent one of the outliers from issuing an unlawful summons.").  Since then,
however, it has become evident that responsibility for halting enforcement lies not
only with those officers who issue illegal summonses, but also with those who
train, oversee, and control the officers' work.

34

prove insufficient, additional action will be required.  Without the prospect of

sanctions, the City's attention will wane and enforcement will surely rise again.

   I agree with plaintiffs that a monetary fine per future incident of

enforcement is the only remedy that will bring about true, long-term compliance

with the Orders.  Given the City's long history of non-compliance and routine

apathetic attitude toward ending the illegal enforcement, the City has demonstrated

that nothing less than the prospective threat of immediate and severe consequences

will motive it to comply with the Court's Orders.  The City is therefore

prospectively fined for each future violation of the Orders, payable to the Court.

To ensure compliance in the long-term, the fine shall grow progressively.  The fine

shall begin at $500 per incident of enforcement.  Every three months thereafter, the

fine shall increase by $500.  The maximum fine shall be $5,000 per incident of

enforcement.[111]

   As a "purge" provision, the City shall avoid fines if it files and

publishes within 60 days, an affirmation of its intention to abide by the Orders, and

---

[111]  The City's operating budget for the fiscal year ending June 30, 2010 is
$59.5 billion. *See* The City of New York, Office of Management and Budget,
*Frequently Asked Questions*, http://www.nyc.gov/html/omb/html/faq/faq.shtml
(last visited Apr. 22, 2010).  Therefore, the City certainly has the means to pay the
modest fine imposed herein.  The magnitude of the City's budget also makes clear
that the fine is intended to coerce compliance with the Court's Orders, rather than
to serve punitive purposes.

then abides by them.  If the City conforms its conduct to the Court's Orders, it will

escape an obligation to pay fines.  "It is therefore clear that punishment for past

wrongdoing is not the objective of the fines, but rather coercion of the defendants

to conform their conduct to the court's order."[112]  Thus, the City holds "the

proverbial 'key' to [its] prison."[113]  As an additional purge provision, no fine shall

accrue during the 6 months following this Order, so that the City is furnished a

grace period in which to comply with the Court's Orders before financial penalties

are assessed.

## B.     Preliminary Injunction

Plaintiffs seeks an order preliminary enjoining the City to take

numerous remedial steps to halt enforcement of the Statutes once and for all and to

institutionalize the City's anti-enforcement program.[114]  However, because the

contempt citation and attendant monetary sanction for future unlawful summonses

create a sufficient incentive for the City to fully eliminate enforcement of the

Statutes, further injunctive relief is not warranted at this time.  Accordingly, I deny

plaintiffs' request for a preliminary injunction without prejudice.

---

[112]     *New York State Nat'l Org. For Women v. Terry*, 159 F.3d 86, 95 (2d
Cir. 1998).

[113]     *ACLI*, 1995 WL 731627, at *4.

[114]     *See* Pl. Mem. at 24-29 (outlining requested injunctive relief).

## C. Discovery Sanctions

Pursuant to Federal Rule of Civil Procedure 37(d) and/or the Court's inherent power, plaintiffs seek discovery sanctions against the City for failing to preserve hard copies of at least 34 summonses issued under the Statutes from June 2007 to date.

### 1. Applicable Law

"It is well established that the duty to preserve evidence arises when a party reasonably anticipates litigation."[115]   As I have stressed elsewhere, "parties need to anticipate and undertake document preservation with the most serious and thorough care, if for no other reason than to avoid the detour of sanctions."[116] Responsibility for adherence to the duty to preserve lies not only with the parties but also, to a significant extent, with their counsel.[117]   Depending on the extent and circumstances of any loss of evidence, also known as spoliation, the spoliator may

---

[115]    *Pension Comm. of Montreal Pension Plan v. Banc of Am. Sec.* ("*Pension Comm.*"), __ F. Supp. 2d __, No. 05 Civ. 9016, 2010 WL 184312, at *4 (S.D.N.Y. Jan. 15, 2010). *Accord Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001); *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 218 (S.D.N.Y. 2003) ("Once a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents.").

[116]    *Pension Comm.*, 2010 WL 184312, at *7.

[117]    *See Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 432 (S.D.N.Y. 2004) ("Counsel must oversee compliance with the ligation hold, monitoring the party's efforts to retain and produce the relevant documents.").

be subject to a range of sanctions, from cost-shifting or fines, to adverse inferences or preclusion of evidence, to dismissal or default judgment.[118]

To prove spoliation, the innocent party must establish three elements: "that the spoliating party (1) had control over the evidence and an obligation to preserve it at the time of destruction or loss; (2) acted with a culpable state of mind upon destroying or losing the evidence; and that (3) the missing evidence is relevant to the innocent party's claim or defense."[119] "Relevance and prejudice may be presumed when the spoliating party acted in bad faith or in a grossly negligent manner. . . . However, when the spoliating party was merely negligent, the innocent party must prove both relevance and prejudice in order to justify the imposition of a severe sanction."[120]

### 2.    Analysis

The City's duty to preserve with respect to section 240.35(3) arose in at least January 2003 when the City was sued by an individual wrongfully arrested under that provision, and the City subsequently compensated that individual to settle the case. The City's duty to preserve with respect to section 240.35(1) arose

---

[118]    *See Pension Comm.*, 2010 WL 184312, at *6-*7 (discussing remedies for spoliation).

[119]    *Id.* at *5 (citing *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002)).

[120]    *Id.*

38

in at least June 2005, when the *Brown* litigation was commenced.  And the City's

duty to preserve with respect to section 240.35(7) arose in at least March 2007,

when the NYPD's Chief of Patrol circulated a memorandum to all Commanding

Officers stating that subsections 1, 3, and 7 were unconstitutional and

unenforceable.

The City does not dispute that, notwithstanding this duty, it failed to

produce at least thirty-four hard copies of summonses issued for the Statutes since

June 2007.  Instead, the City argues that it should not be sanctioned because it has

produced to plaintiffs approximately 680 summonses in hard copy, and because

OCA was in possession of the missing summonses when they were lost.  It is

undisputed, however, that each of the summonses *originated* with the NYPD;

therefore, the City had possession and control over the lost summonses despite

their later having been sent to OCA.  Once the duty to preserve arose, the City was

under an obligation to retain copies of all summonses issued under the Statutes.

Turning to the City's culpability, I conclude that this loss of evidence

was the result of negligent — as opposed to grossly negligent, willful, or

intentional — conduct.[121]  As noted, the City has produced approximately 680 hard

copy summonses to plaintiffs, meaning the missing thirty-four account for

---

[121]     *See id.* at *2-*3 (defining negligence, gross negligence, and
willfulness in the discovery context).

approximately five percent of the total production of hard copy summonses from June 2007 forward.[122]  Of course, the omission of a small number of documents from a large production may support a finding of greater culpability where other evidence or context suggests a selective production.  However, plaintiffs have not shown the City to have had a state of mind more culpable than negligence and, indeed, the City represents that the NYPD's standard practice is "not [to] retain the top copy of the summons which contains the narrative since NYPD must send this copy to OCA."[123]

Because the City was negligent in losing hard copy summonses, plaintiffs must prove relevance and prejudice in order to justify a harsh sanction. Relevance is obvious.  As to prejudice, the hard copy of a summons is the only document containing the "narrative" portion of a summons that describes the alleged misconduct.  Without the hard copy, the only contemporaneous evidence of what the officer alleges occurred is lost.  Plaintiffs are prejudiced as a result.  For example, the City argues with respect to the merits of this case that "[t]o the extent that plaintiffs have alleged that a summons issued under the Statutes per se resulted in a Fourth Amendment violation, their argument fails . . . if there was probable cause to believe that the person summonsed was involved in any criminal activity

---

[122]     *See* DeBellis Decl. ¶ 54.

[123]     Def. Mem. at 23 (citing DeBellis Decl. ¶ 53).

at the time, not necessarily the activity contemplated under the Statues."[124]

Assuming the City's argument is legally sound, one important way that plaintiffs

can refute such a contention is by pointing to the narrative portion of the summons

itself. Plaintiffs can no longer do this for the missing hard copy summonses.

Having shown that the City committed spoliation, plaintiffs are

entitled to a remedy. Plaintiffs request an "adverse inference that for every one of

the 34 (and perhaps more) summonses not produced by defendants, the record

would have revealed no legal basis for the summons being issued other than the

violation of the unconstitutional loitering law."[125] This is an entirely reasonable

sanction in the circumstances: Because the narrative portion of the missing

summonses are no longer available due to the City's negligence, it is appropriate to

infer that these narratives would not have been favorable to the City. Monetary

sanctions in the form of attorneys' fees are also appropriate.[126]

---

[124]    *Id.* at 19 (citing *Devenpeck v. Alford*, 543 U.S. 146 (2004)).

[125]    Pl. Mem. at 31-32.

[126]    *See Pension Comm.*, 2010 WL 184312, at *7 ("Monetary sanctions
are appropriate to punish the offending party for its actions and to deter the
litigant's conduct, sending the message that egregious conduct will not be
tolerated. Awarding monetary sanctions serves the remedial purpose of
compensating the movant for the reasonable costs it incurred in bringing a motion
for sanctions." (quotation marks, alterations, and footnote omitted)).

**D.    Attorneys' Fees and Costs**

Courts have "'broad discretionary power' . . . to fashion equitable

remedies which are 'a special blend of what is necessary, what is fair, and what is

workable.'"[127] A court "may award appropriate attorney fees and costs to a victim

of contempt."[128] "[E]ven where a court declines to issue a citation of contempt for

violations of the court's orders, attorneys' fees and costs may be recoverable where

the 'bringing of the action should have been unnecessary and was compelled by . . .

unreasonable, obdurate obstinacy.'"[129] In *Brown I*, though I declined to hold the

City in contempt, I nonetheless awarded plaintiff Brown reasonable fees and costs

because "defendants' defiance of the June 23, 2005 Order necessitated the bringing

of [that] contempt proceeding . . . ."[130] The present citation of contempt and

---

[127]    *Class v. Norton*, 376 F. Supp. 496, 501 (D. Conn. 1974) (quoting
*Lemon v. Kurtzman*, 411 U.S. 192, 200 (1973)), *aff'd in part, rev'd in part*, 505
F.2d 123 (2d Cir.) (denying contempt citation but granting attorneys' fees to party
prosecuting contempt motion).

[128]    *Weitzman*, 98 F.3d at 719.

[129]    *Brown I*, 2007 WL 1573957, at \*6 (quoting *Class*, 505 F.2d at 127).
*Accord Crescent Publ'g Grp. v. Playboy Enters.*, 246 F.3d 142, 147 (2d Cir. 2001)
(emphasizing that "the decision to award fees rests in the court's equitable
discretion" and noting that "nonexclusive factors" courts may consider include
"'frivolousness, motivation, objective unreasonableness . . . and the need in
particular circumstances to advance considerations of compensation and
deterrence'" (quoting *Fogerty v. Fantasy*, 510 U.S. 517, 534 n. 19 (1994)).

[130]    *Brown I*, 2007 WL 1573957, at \*6 (citing, for example, *Commodity
Futures Trading Comm'n v. Sirras*, Misc. No. M 31, 1984 WL 391, at \*1

discovery sanctions warrant the imposition of reasonable attorneys' fees and costs to plaintiffs for their efforts with respect to this motion.

## IV.   CONCLUSION

For the reasons set forth above, plaintiffs' motion for contempt and discovery sanctions is granted.  Plaintiffs' motion for a preliminary injunction is denied without prejudice.  Plaintiffs are directed to submit a fee application by May 14, 2010.  The Clerk of the Court is directed to close this motion (document number 36).  A conference is scheduled for May 12, 2010 at 2:30 p.m.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            April 26, 2010

_____

(S.D.N.Y. Apr. 27, 1984) (finding no need to adjudge party in contempt to assure future compliance with court order, but awarding proponent reasonable attorneys' fees and costs)).

## - Appearances -

### For Plaintiffs:

Katherine Rosenfeld, Esq.
Matthew D. Brinckerhoff, Esq.
Emery Celli Brinckerhoff LLP
75 Rockefeller Plaza, 20th Floor
New York, New York 10019
(212) 763-5000

J. McGregor Symth, Jr., Esq.
The Bronx Defenders
860 Courtlandt Avenue
Bronx, New York 10451
(718) 838-7878

Earl Ward, Esq.
75 Rockefeller Plaza, 20th Floor
New York, New York 10019
(212) 763-5070

### For Defendants:

Rachel Seligman Weiss
Linda Donahue
Assistant Corporation Counsel
New York City Law Department
100 Church Street
New York, New York 10007
(212) 788-0784
(212) 788-0892